STATE OF NORTH CAROLINA v. DAVID ALLEN SOKOLOWSKI

No. 468A98

(Filed 3 December 1999)

## 1. Homicide— first-degree murder—corpus delicti—criminal act—premeditation and deliberation—sufficient evidence

The evidence was sufficient to permit a reasonable juror to find beyond a reasonable doubt that defendant was guilty of premeditated and deliberate murder of the victim (his live-in girlfriend), although her body was never recovered, where circumstantial evidence presented by the State tended to show: (1) defendant had wooden pallets delivered to his house; (2) defendant built a bonfire with some of the pallets in mid-February 1992

around the time the victim mysteriously disappeared; (3) defendant made contradictory statements as to the victim's whereabouts; (4) defendant made incriminating comments to two friends, concluding that he had had the victim "tooken (sic) care of"; (5) defendant concealed the victim's corpse by the hideous indignities of dismemberment and burning; (6) defendant built a second bonfire on 9 March 1992 and a male neighbor's remains were found burning in this fire; (7) police found the neighbor's severed ears as well as the severed ears of the victim at defendant's house; (8) defendant possessed the victim's bloody shirt and bloody bra; (9) the victim's shirt had a hole in the back "consistent with an injury resulting from a gunshot wound"; (10) the victim's clothes were cut up the back as if to remove them from her torso; (11) charred bone and skull fragments were found in a hole 300 feet from defendant's house in a location where he indicated to a friend that the victim was located; and (12) the victim's important belongings were found at defendant's house.

**2. Jury— defendant's conviction of another murder—knowledge by prospective jurors—refusal to excuse**

The trial court did not abuse its discretion in refusing to excuse five prospective jurors for cause in this first-degree murder prosecution because they had some knowledge, through news media accounts, of defendant's conviction of another murder which was connected to the murder of this victim by a common plan or scheme where each of the five jurors said that he or she could set aside knowledge of defendant's prior murder conviction and decide guilt or innocence based solely on the evidence presented at trial, and the record provides no basis for a conclusion that any juror based his or her decision upon pretrial information.

**3. Homicide— premeditation and deliberation—conduct toward corpse, concealment of body**

The trial court did not err when it instructed the jury that it could consider defendant's unseemly conduct toward the victim's corpse and concealment of her dead body to infer premeditation and deliberation.

**4. Evidence— subsequent crime or act—similar modus operandi—identity**

Evidence concerning defendant's subsequent murder of a second person and his attempt to burn that person's body was

admissible in this first-degree murder prosecution where the unusual, unique, and bizarre circumstances of the two deaths, including the dismemberment of the bodies, the severing of the ears from those two bodies, the saving of those ears by defendant, and the building of two bonfires by defendant, one about the time this victim mysteriously disappeared and the other at the time the second person's charred head and body parts were found, reveal a contrived, common plan showing the same person committed both crimes.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgment imposing a sentence of life imprisonment entered by Grant (Cy A.), J., on 26 October 1994 in Superior Court, Orange County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court 13 September 1999.

*Michael F. Easley, Attorney General, by Thomas F. Moffitt, Special Deputy Attorney General, for the State.*

*Ann B. Petersen for defendant-appellant.*

FREEMAN, Justice.

On 16 March 1992, defendant David Allen Sokolowski was indicted for the first-degree murder of Pamela Owens Ellwood. Pamela Ellwood's body was never recovered. Defendant was tried noncapitally before a jury, and on 26 October 1994, the jury found him guilty. Thereafter, the trial court sentenced defendant to a term of life imprisonment to be served consecutively with a life sentence imposed in March 1994 for the first-degree murder of Rubel Hill.

The State claimed defendant killed Ellwood, dismembered her body, and burned her body parts in their backyard. The State's evidence tended to show that in early 1992, defendant and Ellwood lived in a farmhouse in a rural part of Orange County near Hillsborough. The couple had lived together under the name of Pamela and David Ellwood for a number of years prior to 1992. Sometime in mid-February 1992, Pamela Ellwood (Ellwood) mysteriously disappeared.

The State presented evidence from several witnesses indicating that the last time anyone ever saw Ellwood alive was 9 February 1992, and is summarized as follows: On 7 February 1992, Stanley Hutchins saw Ellwood for the last time when he met defendant and Ellwood at a grocery store to pay them for some construction work

they had done. Ellwood was also seen by Robert Rice (Rice) when she bought a Citation car from him on 7 February 1992. On 9 February 1992, Ellwood telephoned Rice to tell him the car would not start. Rice went to defendant and Ellwood's house. This was the last time Rice ever saw or heard from Ellwood again. Defendant and Ellwood also went to Winston-Salem to visit her parents on 9 February, which was the last time Ellwood's parents ever saw or heard from her. On 10 February 1992, Rice took a starter to defendant and Ellwood's home to fix Ellwood's car, and defendant helped Rice install the starter. Rice did not see Ellwood that day. When he asked defendant about Ellwood, defendant said she was at work. Rice testified the Citation remained in the front yard for the next two weeks. Thereafter, Rice noticed the front tires of the automobile had been removed.

Ellwood and defendant's landlord, Robert Strayhorn (Strayhorn), initially testified that the last time he saw Ellwood was 1 March 1992, when she paid the monthly rent. However, Strayhorn corrected his testimony when he remembered the last time he saw Ellwood was when she got out of her Citation automobile sometime in February 1992. As previously mentioned, Ellwood bought this car from Rice on 7 February 1992. Two days later on 9 February, the Citation was not running.

Further testimony by Strayhorn showed that in mid-February 1992, he saw defendant unloading from a delivery truck a large number of wooden pallets and stacking them in piles in his yard. Sometime later in February, after the last time Strayhorn had seen Ellwood, Strayhorn was tending to his farm animals and saw defendant in the backyard using some of the pallets to fuel a large bonfire. Upset about the bonfire because the yard had been in such good shape, Strayhorn drove from the pasture to the yard to ask defendant about it. When Strayhorn got out of his truck, defendant left the fire and met Strayhorn at the truck. Strayhorn asked defendant why he got the pallets if he was just going to burn them. Defendant replied that some boys wanted to repair and sell them, but defendant got tired of looking at them. However, defendant was not burning all of the pallets at that time.

The State's evidence revealed that for the remainder of February 1992 and the early part of March 1992, defendant gave contradictory stories to various people concerning Ellwood's whereabouts. On 15 February 1992, Keith Wilkerson visited defendant's home and asked

where Ellwood was. Defendant responded that she was in Winston-Salem. However, Wilkerson noticed the pickup truck and Ellwood's car were both still in the front yard. On 21 February 1992, Charlene Thornton (Thornton) visited defendant's house and asked if Ellwood was home. Defendant told Thornton that Ellwood was in Winston-Salem and that she would be returning in a week.

On 8 March 1992, Ellwood's parents came to check on their daughter because they had not heard from her since they saw her on 9 February 1992. Ellwood's mother testified that Ellwood usually spoke to them about twice a month by telephone. When Ellwood's parents arrived at their daughter's house, Ellwood's father blew on the car horn to announce their arrival. Ellwood's parents walked to the front door and started to go inside, but Ellwood's father felt resistance on the door causing them to stop. Thereafter, Ellwood's mother walked to the right side of the house while Ellwood's father walked to the left side of the house. Ellwood's father heard his wife talking to someone at the back of the house. On joining his wife, he found her talking to defendant, who had a pistol and shotgun with him. Defendant told them Ellwood had gone shopping in Durham with a friend named Leann Hill, and they would not be home until after dark. Ellwood's parents returned to their own home in Winston-Salem without seeing their daughter. Later that same day, Curtis Bauer (Bauer) saw defendant pour gasoline onto a pile of wooden pallets, igniting a large bonfire.

The State presented evidence contradicting defendant's 8 March assertions to Ellwood's parents that Virginia "Leann" Hill (Leann) had gone shopping with Ellwood. Leann testified the last time she saw Ellwood was at the beginning of February 1992 when Ellwood gave Leann a haircut. Leann stated she usually came to Ellwood and defendant's house twice a month to get her hair cut. When Leann returned to their house sometime in late February or early March to get a haircut, defendant told her that Ellwood had left him and had gone to her parents' house in Winston-Salem. Leann testified that she saw boxes of Ellwood's items in the living room.

The State also provided evidence that defendant made incriminating statements to different people indicating he killed Ellwood. On 5 March 1992, defendant's friend Kevin Folmar (Folmar) was at defendant's house, along with Bauer, watching television. While Bauer was asleep in a chair, defendant looked at Folmar and said, "[Ellwood's] out there and [Hill's] in yonder. Or vice versa." Folmar

testified that defendant motioned with his finger outside the house, and then he pointed towards the bedroom area with his other hand. When Darryl Underwood (Underwood) was questioned by the police on 11 March 1992, he testified that he had been at defendant's house and had asked about Ellwood. Defendant responded that he "had [Ellwood] tooken [sic] care of."

On 9 March 1992, police officers went to Ellwood and defendant's home, and saw a large bonfire. In addition, officers noticed an area under the left side of the house that had been dug out as if construction work was in progress. When officers looked into the fire, they saw a badly burned human head, a separate portion of the torso of a human body, and some bone fragments. Defendant told officers the remains in the fire were his neighbor Rubel Hill (Hill). A later forensics examination of the remains in the fire confirmed it was Hill.

Officers continued to search the backyard. They sifted through the contents of a hole near the shed in the backyard, approximately three hundred feet from the residence, and found charred bone and skull fragments. When officers searched around the house, they found two human ears on the deck behind the house under some rugs. These ears were later identified as Hill's. A medical examiner concluded the ears had been severed from Hill's head with a sharp object.

Inside defendant's house, officers found a plastic bag that contained female clothing, including a blood-soaked bra, a blood-soaked sweatshirt, and socks. Defendant told officers the clothing in the plastic bag belonged to "his old lady," meaning Ellwood. When questioned about the clothing, defendant claimed he had been in a fight with Ellwood several weeks before and she had left him. The clothing found in the plastic bag was determined to be covered in human blood. However, the clothing was too putrid to test for blood type. A subsequent review of the contents of the plastic bag revealed the shirt had been cut from the hem in the back straight up to the neck, the bra straps had been cut from the back, and the shirt contained a hole in the back that was "consistent with an injury resulting from a gunshot wound."

On 11 March 1992, officers returned to defendant's house for a further search. Officers found a third ear in an ice tray in the freezer, testicles in the refrigerator, and a fourth ear inside a hollowed-out gourd on the kitchen table. An examination of these two ears revealed they had also been severed with a sharp object. The left ear

had a pierced lobe, and the right ear had a gold pierced earring with a green stone in place. Ellwood's mother testified the earring belonged to her daughter. Subsequent forensic tests showed both ears were Ellwood's.

**[1]** Defendant's first issue on appeal is whether the trial court erred when it denied defendant's motion to dismiss the charge of first-degree murder. Defendant contends the evidence was insufficient to permit a reasonable juror to find beyond a reasonable doubt that defendant was guilty of the premeditated and deliberate murder of Ellwood.

When the trial court considers a motion to dismiss, it is "concerned only with the legal sufficiency of the evidence to support a verdict, not its weight, which is a matter for the jury." *State v. Blake*, 319 N.C. 599, 604, 356 S.E.2d 352, 355 (1987). The State gets the benefit of all reasonable inferences drawn from the evidence. *State v. Scott*, 296 N.C. 519, 522, 251 S.E.2d 414, 416 (1979). The test for sufficiency of the evidence is the same whether it is circumstantial, direct, or both. *State v. Jones*, 303 N.C. 500, 504, 279 S.E.2d 835, 838 (1981). If the evidence is sufficient to raise only a suspicion as to either the commission of the offense or the identity of defendant as the perpetrator, the motion to dismiss should be allowed. *State v. Cutler*, 271 N.C. 379, 383, 156 S.E.2d 679, 682 (1967). If the evidence at trial gives a reasonable inference of guilt, the jury must decide whether the facts show defendant's guilt beyond a reasonable doubt. *Id.*

Although defendant concedes there is sufficient circumstantial evidence to determine that Ellwood is dead, defendant claims the State offered no direct evidence that Ellwood's death was caused by a criminal act. Defendant claims the only evidence of possible criminal harm was the bag of blood-stained female clothes. However, defendant contends the State could only speculate that Ellwood was wearing these clothes at the time of her death. Further, defendant claims that even if the State provided evidence that Ellwood died as the result of a criminal act, the State has failed to prove defendant killed Ellwood.

Contrary to defendant's assertions, there was sufficient evidence in addition to Ellwood's bloody clothes for the jury to consider and convict defendant of the first-degree murder of Ellwood. "The *corpus delecti* may be established by direct or circumstantial evidence." *State v. Bishop*, 272 N.C. 283, 299, 158 S.E.2d 511, 522 (1968). As to the issue of defendant's responsibility for Ellwood's death, the jury

could properly consider the evidence relating to the manner in which defendant tried to dispose of Hill's body because "[t]he other crime may be offered on the issue of defendant's identity as the perpetrator when the *modus operandi* of that crime and the crime for which defendant is being tried are similar enough to make it likely that the same person committed both crimes." *State v. Carter*, 338 N.C. 569, 588, 451 S.E.2d 157, 167 (1994), *cert. denied*, 515 U.S. 1107, 132 L. Ed. 2d 263 (1995). In the instant case, there was a rational connection between defendant's unseemly conduct towards Ellwood's corpse and the concealment of her dead body, leading to a logical inference that defendant killed Ellwood and disposed of her body in the same manner as Hill's corpse. The State presented evidence that after obtaining a large number of wooden pallets, defendant built a bonfire with some of the pallets sometime in mid-February 1992, around the time witnesses testified Ellwood disappeared. On 9 March 1992, police discovered defendant had, with more of the pallets, built a second bonfire and Hill's remains were found burning in the fire. One of the items in the fire was Hill's severed head with his two ears missing. The police found Hill's two severed ears, as well as the severed ears of Ellwood, at defendant's house.

An officer testified that defendant said he attempted to bury Hill, but it was too much trouble so he decided to burn the body. Thereafter, the police looked in holes in the yard for additional evidence. The officers found charred human bone and skull fragments in an area where defendant previously pointed out to Folmar that Ellwood was located. Further, defendant told Underwood that he "had [Ellwood] tooken [sic] care of." This circumstantial evidence provided proof of defendant's criminal agency and an explanation for the reason the police were unable to find the rest of Ellwood's body.

"Premeditation and deliberation generally must be established by circumstantial evidence, because both are processes of the mind not ordinarily susceptible to proof by direct evidence." *State v. Rose*, 335 N.C. 301, 318, 439 S.E.2d 518, 527, *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 883 (1994). One of "the circumstances to be considered in determining whether a killing was done with premeditation and deliberation is 'the conduct and statements of the defendant before and after the killing.' " *Id.* (quoting *State v. Small*, 328 N.C. 175, 181-182, 400 S.E.2d 413, 416 (1991)). The State presented evidence that sometime in February 1992, Ellwood disappeared, and afterwards, defendant gave conflicting responses for her absence. As previously stated, defendant indicated to some people that Ellwood was in Winston-

Salem, to others that Ellwood was out shopping, and to still others that she had left him and moved back in with her parents. However, the State's evidence reveals Ellwood did not go to Winston-Salem, she was not out shopping, and she did not go back to her parents' house to live. In fact, Ellwood's parents had not seen her since she visited them in Winston-Salem on 9 February 1992.

In addition to his contradictory statements, defendant more importantly made incriminating statements to friends concerning the whereabouts of Ellwood, including a statement to Underwood that he "had [Ellwood] tooken [sic] care of." Folmar testified that defendant said he had "[Ellwood] out here and [Hill] in yonder. Or vice versa." The State contends when Folmar asked defendant about Ellwood, defendant said Ellwood is "out there," pointing to the backyard. The State claims it can be reasonably inferred that defendant was talking about the area approximately three hundred feet behind the house, where the additional skull and bone fragments were found. Defendant's contradictory statements, concerning the whereabouts of Ellwood, and incriminating statements, indicating to acquaintances that he killed Ellwood, point to defendant as having killed Ellwood with premeditation and deliberation.

Another factor for this Court to consider on the question of premeditation and deliberation is that "any unseemly conduct towards the corpse of the person slain, or any indignity offered it by the slayer, as well as concealment of the body, are evidence of express malice, and of premeditation and deliberation in the slaying." Rose, 335 N.C. at 318, 439 S.E.2d at 527. Officers searched the location behind the residence and found evidence of bone fragments, including pieces of a charred human skull, in a hole that was approximately three hundred feet behind defendant's residence, and searched the bonfire site at the residence where Hill's skull and partial torso were found. The State contends these charred bone and skull fragments were Ellwood's, as they were found in the area where defendant was pointing out the window when he told Folmar that Ellwood was "out there."

In subsequent investigations, officers found Ellwood's ears, one in a gourd on the kitchen table with her earring still in it and the other in the freezer. The ears were tested and compared with the blood from her parents to verify they were Ellwood's. A medical examiner testified that these ears had been severed with a sharp object, in a similar manner as the ears severed from Hill's head.

In addition, officers found a plastic bag of Ellwood's clothing, including a bloody bra, a bloody shirt, and a pair of socks. The back of the shirt had been cut straight up from hem to neck, and it had a hole in the back "consistent with an injury resulting from a gunshot wound." SBI agents testified the bra and shirt had a lot of blood on them. Defendant's explanation to the officers that he had been in a fight with his "old lady" did not explain why there was so much blood. Even if defendant had been in a fight with Ellwood, the State contends, this still did not explain why Ellwood's shirt had a straight, neat cut all the way up the back from the bottom to the top, or why her bra straps had been cut (nor does it explain the hole in the back of the shirt "consistent with an injury resulting from a gunshot wound"). The State concluded the shirt was cut up the back to remove it from Ellwood's body before she was dismembered and her body burned.

Moreover, the State's evidence revealed that in early February 1992, Strayhorn observed a large stack of wooden pallets in Ellwood and defendant's yard being delivered. Defendant had a large stack of pallets in one location and was burning a smaller group of pallets that had been moved to another location only ten to twelve feet from the rest of the pallets. Strayhorn chastised defendant because defendant had a fire burning in the yard. Defendant indicated the reason he was burning the pallets was because he was tired of looking at them. However, he was only burning some of the pallets, not all of them.

Testimony was presented that defendant used the pallets in a similar manner on the Sunday prior to the officers going there in March. Both times, defendant ignited the pallets with gasoline. In the second fire, officers discovered the remains of Hill. They also discovered through forensic tests on Hill's ears that they had been removed by a sharp object.

The State also presented evidence that defendant pawned Ellwood's belongings, including her guitar and two tires from her recently purchased car. Rice, who sold the car to Ellwood, testified that he asked defendant why he sold the two tires from the car before the car was paid off. Even though the car belonged to Ellwood, defendant told Rice he could take the car back if he wanted. This statement indicates that, contrary to defendant's assertions to various people, he did not expect Ellwood to return.

Further, evidence showed that Ellwood's important belongings, including her jewelry chest, a Bible she had received as a wedding

present, a wallet with pictures in it, a family photo album she had for twenty-seven years, combs and brushes, her clothes, and her recently purchased car remained at the farmhouse. The fact that these important items were left behind contradict defendant's statements that Ellwood had left him and moved to Winston-Salem to live with her parents. Had she left defendant, as he claimed, she would have taken these items with her.

Viewed in the light most favorable to the State, there was sufficient circumstantial evidence of all the essential elements of the crime of first-degree murder. As this Court has previously held,

> [c]ircumstantial evidence may be of two kinds, consisting either of a number of consecutive links, each depending upon the other, or a number of independent circumstances all pointing in the same direction. In the former case it is said that each link must be complete in itself, and that the resulting chain cannot be stronger than its weakest link. In the latter case the individual circumstances are compared to the strands in a rope, where no one of them may be sufficient in itself, but all together may be strong enough to prove the guilt of the defendant beyond reasonable doubt. But it necessarily follows that in either case every individual circumstance must in itself at least *tend* to prove the defendant's guilt before it can be admitted as evidence. No possible accumulation of irrelevant facts could ever satisfy the minds of the jury beyond a reasonable doubt.

*State v. Austin*, 129 N.C. 534, 535, 40 S.E. 4, 5 (1901). In the instant case, the total of all the evidence is similar to strands in a rope. The strands of circumstantial evidence presented by the State included: (1) Ellwood's mysterious disappearance after 9 February 1992; (2) defendant's contradictory statements as to Ellwood's whereabouts; (3) his incriminating comments, including he "had [Ellwood] tooken [sic] care of"; (4) defendant's unseemly conduct toward Ellwood's corpse, including concealing it by the hideous indignities of dismemberment and burning; (5) the fact Ellwood's shirt had a hole in the back "consistent with an injury resulting from a gunshot wound"; (6) the fact defendant possessed Ellwood's bloody shirt and bloody bra; (7) the fact Ellwood's clothes were cut up the back as if to remove them from her torso; (8) the fact he saved Ellwood's ears; (9) the fact he had pallets delivered to the house that were used to fuel bonfires; (10) the fact charred bone and skull fragments were found in a hole three hundred feet from the house in a location where he indicated to

**STATE v. SOKOLOWSKI**

[351 N.C. 137 (1999)]

Folmar that Ellwood was located; and (11) the fact Ellwood's important belongings were found at the farmhouse. Each of these strands is relevant and tends to prove defendant's guilt. All of the strands together are strong enough to provide ample evidence of premeditation and deliberation. Thus, the trial court properly denied the motion to dismiss.

[2] In his second assignment of error, defendant claims the trial court erred when it refused to excuse five of the prospective jurors for cause because, based on news media accounts, they had some knowledge about defendant's earlier conviction for the murder of Hill. "Due process requires that the accused receive a trial by an impartial jury free from outside influences." *State v. Boykin*, 291 N.C. 264, 269, 229 S.E.2d 914, 917 (1976). Counsel may challenge for cause an individual juror if the juror is unable to render a fair and impartial verdict. N.C.G.S. § 15A-1212(9) (Supp. 1998). However, the trial court's decision to dismiss a juror for cause is discretionary and will not be disturbed absent an abuse of discretion. *State v. Jaynes*, 342 N.C. 249, 270, 464 S.E.2d 448, 461 (1995), *cert. denied*, 518 U.S. 1024, 135 L. Ed. 2d 1080 (1996). The test for determining if a prospective juror is able to render an impartial verdict is "whether the trial court can reasonably conclude from the *voir dire* examination that a prospective juror can disregard prior knowledge and impressions, follow the trial court's instructions on the law, and render an impartial, independent decision based on the evidence." *Id.*

In the instant case, defendant concedes that each of the five jurors challenged for cause said they could set aside their knowledge of defendant's prior first-degree murder conviction for the death of Hill and could decide guilt or innocence based solely on evidence presented at trial. However, defendant contends none of these prospective jurors knew during *voir dire* that the State would offer evidence at trial that the Hill murder was connected to the alleged murder of Ellwood because of a common plan or scheme. Defendant claims the fact that these five prospective jurors knew prior to defendant's trial that he was convicted of the first-degree murder of Hill requires a presumption of partiality and disqualification, despite the statements that they could judge defendant based solely on the evidence presented at trial.

As this Court has previously stated, "[w]e presume that jurors will tell the truth; our court system simply could not function without the ability to rely on such presumptions." *State v. Barnes*, 345 N.C.

184, 207, 481 S.E.2d 44, 56, *cert. denied,* 522 U.S. 876, 139 L. Ed. 2d 134 (1997), and *cert. denied,* 523 U.S. 1024, 140 L. Ed. 2d 473 (1998). Since a prospective juror's bias may not always be provable with unmistakable clarity, this Court must defer to the trial court's judgment concerning the prospective juror's ability to follow the law. *State v. Davis,* 325 N.C. 607, 624, 386 S.E.2d 418, 426 (1989), *cert. denied,* 496 U.S. 905, 110 L. Ed. 2d 268 (1990). In the instant case, the record does not provide a basis to conclude that any juror based his or her decision upon pretrial information, rather than the evidence presented at trial. Since defendant did not prove the trial court abused its discretion in concluding these five prospective jurors could render an impartial decision, this assignment of error is overruled.

**[3]** Third, defendant claims the trial court erred when it instructed the jury that it could consider defendant's unseemly conduct toward the victim's corpse and concealment of her dead body to infer premeditation and deliberation. As already noted, this Court has held that unseemly conduct towards a victim's corpse and efforts to conceal the body are relevant as circumstantial evidence of premeditation and deliberation. *Rose,* 335 N.C. at 318, 439 S.E.2d at 527. There was a rational connection between defendant's unseemly conduct towards Ellwood's corpse and concealment of her body, leading to a logical inference that defendant killed her with premeditation and deliberation. Thus, this assignment of error is overruled.

**[4]** Finally, defendant contends the trial court erred when it allowed evidence to be introduced pursuant to Rule 404(b) concerning Hill and defendant's attempt to burn Hill's body. Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (Supp. 1998). Rule 404(b) is "a general rule of inclusion of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but one exception requiring its exclusion if its only probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey,* 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990).

As previously mentioned, the other crime may be offered to show defendant's identity as the perpetrator when the *modus operandi* is similar enough to make it likely that the same person committed both crimes. *Carter*, 338 N.C. at 588, 451 S.E.2d at 167. A prior act or crime is sufficiently similar to warrant admissibility under Rule 404(b) if there are " 'some unusual facts present in both crimes or particularly similar acts which would indicate that the same person committed both crimes.' " *State v. Riddick*, 316 N.C. 127, 133, 340 S.E.2d 422, 426 (1986) (quoting *State v. Moore*, 309 N.C. 102, 106, 305 S.E.2d 542, 545 (1983)). It is not necessary that the similarities between the two situations "rise to the level of the unique and bizarre." *State v. Green*, 321 N.C. 594, 604, 365 S.E.2d 587, 593, *cert. denied*, 488 U.S. 900, 102 L. Ed. 2d 235 (1988). However, the similarities must tend to support a reasonable inference that the same person committed both the earlier and later acts. *State v. Stager*, 329 N.C. 278, 304, 406 S.E.2d 876, 891 (1991).

In the instant case, the unusual, unique, and bizarre circumstances of the two deaths, including the dismemberment of the bodies; the severing of the ears; the saving of those ears; and the building of two bonfires, one about the time Ellwood mysteriously disappeared and the other at the time Hill's charred head and body parts were found, reveal a contrived, common plan showing the same person committed both crimes. These similarities support a reasonable inference that the same person committed both the earlier and later acts. Accordingly, defendant's fourth assignment of error is overruled.

For the foregoing reasons, we conclude defendant received a fair trial.

NO ERROR.