An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-430

NORTH CAROLINA COURT OF APPEALS

Filed: 4 March 2014

STATE OF NORTH CAROLINA

v.

Montgomery County
No. 08 CRS 50760-61

JOSE ANTONIO JAIMES NIETO

Appeal by defendant from judgment entered 31 May 2012 by Judge V. Bradford Long in Montgomery County Superior Court. Heard in the Court of Appeals 26 September 2013.

> *Attorney General Roy Cooper, by Special Deputy Attorney General Richard L. Harrison.*

> *Rudolf Widenhouse & Fialko, by M. Gordon Widenhouse Jr., for Defendant.*

ERVIN, Judge.

Defendant Jose Antonio James Nieto appeals from a judgment sentencing him to life imprisonment without the possibility of parole based upon his conviction for the first degree murder of Khammany Phankhamsao. On appeal, Defendant contends that the trial court erred by denying his motion to dismiss the first degree murder charge that had been lodged against him on the grounds that the evidence was insufficient to establish that he deliberated upon the murder of Mr. Phankhamsao, by admitting

evidence that he attempted to escape from jail after his arrest, and by admitting evidence concerning his conduct during a videotaped interview with investigating officers. After careful consideration of Defendant's challenges to the trial court's judgment in light of the record and the applicable law, we conclude that the trial court's judgment should remain undisturbed.

## I. Factual Background
### A. Substantive Facts
#### 1. State's Evidence

Khammany and Aene Phankhamsao immigrated to the United States from Laos in the 1980s. Their daughter, Villaphanh, who was twenty-one years old at the time of Defendant's trial, dated Defendant "off and on" throughout middle and high school, with this relationship having begun when she was thirteen years old and he was sixteen. About six months into their relationship, Defendant and Villaphanh became sexually active. Although Villaphanh became pregnant during her eighth-grade year, she had a miscarriage.

Approximately one year after their relationship began, Villaphanh introduced Defendant to her mother. Although Mrs. Phankhamsao did not object to her daughter dating, she had always been suspicious of Defendant and did not want Villaphanh to become too close to him. Defendant was aware that the

Phankhamsaos disapproved of his relationship with their daughter.

Mr. Phankhamsao first met Defendant after Villaphanh ran away with him for a week when she was in the eighth grade. After this incident, Mr. Phankhamsao agreed to accept Defendant on the condition that the family's traditions were honored. Unfortunately, Defendant and Mr. Phankhamsao got into an altercation after Defendant came to the family home to break off his relationship with Villaphanh. After his daughter began to cry, Mr. Phankhamsao comforted her, told Defendant to leave, and pushed him away from the property.

Villaphanh became pregnant with a child fathered by Defendant during her sophomore year of high school at a time when she was dating another individual. Defendant denied being the father of the child and requested that a DNA test be administered for the purpose of determining the identity of the child's father, although the test in question was never performed. Throughout her pregnancy, Defendant attempted to make Villaphanh feel guilty given his uncertainty about the identity of the child's father. Mr. Phankhamsao was disappointed when he learned of Villaphanh's pregnancy and told his daughter that she should have heeded his warning about continuing to associate with Defendant. However, Mr.

Phankhamsao also stated that the family would have to deal with the situation at hand as it actually existed.

Villaphanh's daughter, Kaylee, was born on 2 December 2006. In spite of the attitude that Defendant had exhibited during her pregnancy, Villaphanh moved in with him shortly after telling her parents that she had become pregnant. Prior to taking up residence with Defendant, Villaphanh had been living with her grandmother, Ta Souvannasaeng, given her deteriorating relationship with her parents. After Kaylee's birth, Defendant and Villaphanh both lived with Ta Souvannasaeng.

For the first three months of her life, Kaylee was taken to a daycare facility. As a result of the child's repeated illnesses, Ta Souvannasaeng began taking care of Kaylee while Villaphanh was at school and work, with Mrs. Phankhamsao picking Kaylee up from Ta Souvannasaeng's home at some point during the day and keeping Kaylee until Defendant got off work. Three or four months after Kaylee's birth, the family conducted a traditional Laotian blessing ceremony at which Mr. Phankhamsao accepted Defendant's relationship with Villaphanh and introduced Defendant as his son-in-law.

On 22 May 2008, Villaphanh went to school as usual. While she was at school, Villaphanh made an appointment for Kaylee to see a doctor because she had been running a fever that morning.

At approximately 10:00 a.m., while she was taking Kaylee to see a doctor, Villaphanh received a phone call from Defendant, who questioned her about the extent of her contact with an ex-boyfriend and warned her that bad things would happen if she was continuing to talk to him. After learning that Kaylee had contracted influenza, Villaphanh took Kaylee to Ta Souvannaseang's residence and went to work. As she was on her way to work, Villaphanh called Mrs. Phankhamsao and told her to get Kaylee.

Throughout the day, Defendant placed telephone calls and sent text messages to Villaphanh's cell phone and placed telephone calls to her at her work phone. Eventually, Villaphanh sent a text message to Defendant in which she told him that she was staying at her mother's home that night because she needed a break from their relationship. Subsequently, Villaphanh called Mrs. Phankhamsao and requested that Mrs. Phankhamsao pick her up from work given her desire to avoid seeing Defendant. As a result, Mrs. Phankhamsao picked Villaphanh up from work and brought her back to the Phankhamsao home. By 9:00 p.m., when Villaphanh and her sister went to the residence of her sister's boyfriend's to work on a project, Mr. Phankhamsao had gone to bed. Kaylee was put to bed at 9:30 p.m.

After stopping by Ta Souvannaseang's residence at around 10:00 p.m., Defendant went to the Phankhamsao residence for the purpose of locating Villaphanh. When Defendant arrived at that location at approximately 10:15 p.m., he had a tense facial expression. However, he had a polite conversation with Mrs. Phankhamsao, who told him that Villaphanh was not there.

At approximately 10:35 p.m., Defendant returned to the Phankhamsao residence. On that occasion, Defendant used a louder tone of voice and demanded to see Kaylee. After Mrs. Phankhamsao told him that Kaylee was asleep, Defendant departed. As soon as Defendant left, his younger sister came to the house and asked where Villaphanh was. Defendant returned to Ta Souvannasaeng's home at approximately 10:40 p.m., went to his room without speaking to anyone, and put on a jacket.

Defendant came to the Phankhamsao residence for the third time at 10:55 p.m. At that time, Defendant knocked on the door in a repetitive manner, rang the doorbell, and stated that he wanted to speak with Mr. Phankhamsao. After being informed that Mr. Phankhamsao was asleep, Defendant said that he did not care what Mr. Phankhamsao was doing and insisted upon speaking with him. Eventually, Mr. Phankhamsao emerged from his bedroom. As Mrs. Phankhamsao admitted Defendant into the house, Defendant, consistent with Laotian custom, removed his shoes.

After entering the Phankhamsao residence, Defendant began slapping his own face and complaining to Mr. Phankhamsao about the fact that he could not pick up his daughter. After witnessing Defendant "slam" his own face, Mrs. Phankhamsao called the police for the purpose of having Defendant removed from the house. Although Defendant asked Mr. Phankhamsao to come and hit him, the latter responded, "I'm not gonna lay hands on you. If I hit you, it'll kill you."

At that point, Mrs. Phankhamsao pushed Defendant out of the house while making sure that her husband remained inside. After being ejected, Defendant kicked the door and called for Mr. Phankhamsao to come outside. Against the advice of his wife, Mr. Phankhamsao went outside, followed by Mrs. Phankhamsao, who was still on the phone with the police.

After Mr. Phankhamsao came outside, Defendant ran at Mr. Phankhamsao and Mrs. Phankhamsao, pushed both of them, and got between them. At that point, Mr. Phankhamsao told Defendant that, since Defendant was "wanting to hit" him, he would hit Defendant. In response, Defendant emitted a number of expletives. Although Mrs. Phankhamsao pushed Defendant away, he returned to Mr. Phankhamsao's location and hit him. After Mrs. Phankhamsao pushed him away a second time, Defendant staggered

against his car, opened the car door, pulled out a gun,[1] cocked it, and shot Mr. Phankhamsao "right away" in his shoulder.

In spite of the fact that Mr. Phankhamsao fell to the ground after sustaining this shoulder wound, Defendant kept shooting at him, with the second shot having been fired from approximately a foot away. Although Mr. Phankhamsao was able to get up and run away after the firing of the fourth shot, Defendant pursued him. When Mrs. Phankhamsao attempted to assist her husband, Defendant put the gun to her head and prevented her from doing so. After she did not see Defendant for a short period of time, Mrs. Phankhamsao entered the house and closed the door. However, Defendant returned and fired a shot that entered the Phankhamsao residence. At that point, Mrs. Phankhamsao called police again for the purpose of ascertaining why they had failed to come in response to her first call and told them what had occurred. In addition, Mrs. Phankhamsao called Villaphanh at approximately 11:00 p.m. and told her that there had been a problem at the house, that Defendant had been firing gunshots around the house, and that Mr. Phankhamsao was outside with Defendant.

---

[1]As a result of problems that he had been having with certain unrelated individuals, Defendant had purchased a handgun in April 2008 and kept the weapon in a bedroom dresser at Ta Souvannaseang's residence.

Mr. Phankhamsao sustained five gunshot wounds. More specifically, Mr. Phankhamsao was wounded in his left arm, his upper right arm, his right leg, and his left knee. In addition, one bullet grazed Mr. Phankhamsao's upper left arm. The leg wounds that Mr. Phankhamsao sustained had an upward trajectory, a fact that suggested that these wounds had been inflicted while Mr. Phankhamsao was lying on the ground. Mr. Phankhamsao died as the result of asphyxiation stemming from bleeding in his left chest cavity caused by a projectile that entered his right arm, traveled through his arm, and pierced his esophagus and left lung.

In February 2009, Detective Jesse Prado of the Austin, Texas, Police Department received information from a confidential informant to the effect that a North Carolina murder suspect was living in Austin. As a result, Detective Prado contacted Captain Pete Blue of the Montgomery County Sheriff's Office for the purpose of obtaining additional information about the situation. On 6 February 2009, officers of the Austin Police Department were able to capture Defendant, who was eventually extradited to North Carolina. In an interview conducted following his arrest in Texas, Defendant told Detective Prado that Mr. Phankhamsao had been in possession of a gun at the time of the shooting.

## 2. Defendant's Evidence

Defendant, who was twenty-four at the time of trial, immigrated to the United States from Mexico at age five and arrived in Montgomery County when he was six years old. After coming to know Villaphanh while in middle school, Defendant eventually met her parents and obtained permission to visit her in the family home.

After deciding he wanted to end their relationship, Defendant called Villaphanh and told her that, since he had asked and obtained permission from her parents to see her, he planned to come to the Phankhamsao residence for the purpose of informing Mr. Phankhamsao that he and Villaphanh were going their separate ways. When Defendant arrived at the Phankhamsao residence for the purpose of speaking with Mr. Phankhamsao, Villaphanh came outside, begged him not to end their relationship, and began crying. At that point, Mr. Phankhamsao came outside to see what was wrong with Villaphanh and, after speaking with his daughter in their native language, slapped "the fire out of" Villaphanh, causing her to fall to the ground. Once Defendant attempted to protect Villaphanh from her father, Mr. Phankhamsao threatened to shoot Defendant, called him a coward, and chased Defendant down the road as he ran away. Defendant denied that he and Villaphanh had ever run away

together.    Instead, Defendant claimed that he had allowed Villaphanh to stay with him after she told him that her parents had kicked her out of their house.

Defendant and Villaphanh "hooked up" again when Villaphanh became depressed and began using drugs, at which point one of Villaphanh's sisters asked Defendant to talk to her.  Defendant was happy when he learned that Villaphanh was pregnant and set up a meeting between the two families.  At this family meeting, Mrs. Phankhamsao stated that she wanted Villaphanh to have an abortion and only relented after Defendant's mother agreed to take care of the child.  Although Villaphanh lived with Defendant and his mother during the early part of her pregnancy, she subsequently moved in with her grandmother in order to be closer to her physician and to make it easier for her grandmother to help with the child.

On the day of the shooting, Defendant did not make any calls to or receive any calls from Villaphanh and he knew nothing of Kaylee's illness.  When he returned home at approximately 5:00 p.m., Ta Souvannasaeng told Defendant that Mrs. Phankhamsao had come to get Kaylee.  As a result, Defendant called Mrs. Phankhamsao to ascertain whether he needed to pick Kaylee up.  At that point, Mrs. Phankhamsao told Defendant that he could pick Kaylee up later.  Shortly before Villaphanh got

off work, Defendant called her to see if she wanted him to come and get her. At that point, Villaphanh told Defendant that she would get a ride and that she and the baby would wait for him at the Phankhamsao residence.

At the time that Defendant arrived at the Phankhamsao residence, he asked for Kaylee and Villaphanh and was told that, while Kaylee was present, Villaphanh was not. Instead, Defendant was told that Villaphanh had gone to Wal-Mart. As a result, Defendant stated that he would drive towards Wal-Mart to see if he could locate Villaphanh and that he would return to the Phankhamsao residence if his efforts to locate Villaphanh proved unsuccessful.

As a general proposition, Defendant and Villaphanh avoided the Wal-Mart store because Defendant had gotten into a fight with a gang member at that location. After this incident, which had occurred in May, Defendant purchased a handgun, which he had in his possession as he traveled towards the Wal-Mart store. After circling the Wal-Mart parking lot and failing to see Villaphanh's sister's car, Defendant returned to Ta Souvannsaeng's residence to see if Villaphanh's sister had brought Villaphanh and Kaylee there. After finding Villaphanh's cell phone, but not Villaphanh, at Ta Souvannasaeng's home, Defendant returned to the Phankhamsao residence.

Upon arriving at the Phankhamsao residence, Defendant spoke with Mrs. Phankhamsao and suggested that he take Kaylee home while leaving it up to Villaphanh to find a way to Ta Souvannasaeng's house at a later time. At that point, Mrs. Phankhamsao informed Defendant that Kaylee was sleeping, refused to allow him to take her home, and shut the door. After Defendant knocked on the door again, Mr. Phankhamsao answered the door, cursed at Defendant, and asked Defendant what he wanted. After stating that he had come to pick up his child and that he intended to do just that, Defendant removed his shoes and entered the house.

As Defendant reached the interior of the Phankhamsao residence, Mr. Phankhamsao cursed at Defendant, ordered Defendant to leave the house, and threatened Defendant's life. At that point, the two men began pushing each other. After Mr. Phankhamsao took a swing at Defendant, Mrs. Phankhamsao restrained him. After concluding that Mr. Phankhamsao was attempting to get to the kitchen area, where he kept his firearms, Defendant decided to leave. Throughout the entire time that he was inside the Phankhamsao residence, Defendant had his gun in his waist and knew that, if Mr. Phankhamsao got his gun, he and Defendant would have to "kill each other there."

As Defendant left the house, the two men cursed at each other and Mr. Phankhamsao threatened Defendant's life again. While he walked towards his car, Defendant noticed that Mr. Phankhamsao was running towards him. As a result, Defendant pulled out his gun and began firing shots without waiting to determine if Mr. Phankhamsao was armed. Defendant did not, however, shoot at Mrs. Phankhamsao, who returned to the interior of the house. As a result of the incident in question, Defendant developed post-traumatic stress disorder.

After the shooting, Defendant became frightened, discarded the gun, and, eventually, went to Austin, Texas. In the course of his interview with Detective Prado, Defendant stated that he brought the gun with him to pick up Kaylee because he was "pissed." Defendant admitted that he had lied to Detective Prado on multiple occasions and testified that he would have developed a better story if he had had more time to prepare for the interview.

## B. Procedural History

On 23 May 2008, warrants for arrest charging Defendant with assault with a deadly weapon with the intent to kill, communicating threats, injury to real property, and murder were issued. On 16 March 2009, the Montgomery County grand jury returned bills of indictment charging Defendant with first

degree murder and assault with a deadly weapon with the intent to kill. The charges against Defendant came on for trial before the trial court and a jury at the 21 May 2012 criminal session of the Montgomery County Superior Court. On 31 May 2012, the jury returned a verdict convicting Defendant of first degree murder and assault with a deadly weapon. At the ensuing sentencing hearing, the trial court arrested judgment with respect to Defendant's conviction for assault with a deadly weapon and entered judgment sentencing Defendant to life imprisonment without the possibility of parole. Defendant noted an appeal to this Court from the trial court's judgment.

## II. Legal Analysis

### A. Sufficiency of the Evidence

In his first challenge to the trial court's judgment, Defendant argues that the trial court erred by denying his motion to dismiss the first degree murder charge for insufficiency of the evidence. More specifically, Defendant contends that the record does not contains sufficient evidence to permit a determination that Defendant deliberated upon the killing of Mr. Phankhamsao. We do not find Defendant's argument persuasive.

### 1. Standard of Review

"When ruling on a defendant's motion to dismiss, the trial court must determine whether there is substantial evidence (1) of each essential element of the offense charged, and (2) that the defendant is the perpetrator of the offense." *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007) (citing *State v. Earnhardt*, 307 N.C. 62, 65-66, 296 S.E.2d 649, 651 (1982), and N.C. Gen. Stat. § 15A-1227). According to well-established North Carolina law, "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted) (quoting *State v. Cummings*, 46 N.C. App. 680, 683, 265 S.E.2d 923, 925, *aff'd*, 301 N.C. 374, 271 S.E.2d 277 (1980)). "When considering a motion to dismiss, the trial court must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences." *State v. Morgan*, 359 N.C. 131, 161, 604 S.E.2d 886, 904 (2004), *cert. denied*, 546 U.S. 830, 126 S. Ct. 47, 163 L. Ed. 2d 79 (2005). "If the evidence at trial gives a reasonable inference of guilt, the jury must decide whether the facts show defendant's guilt beyond a reasonable doubt." *State v. Sokolowski*, 351 N.C. 137, 143, 522 S.E.2d 65, 69 (1999). "This Court reviews the trial court's denial of a motion to dismiss *de novo*." *Smith*, 186 N.C. App. at 62, 650 S.E.2d at 33 (citing *State v. McKinnon*, 306 N.C.

288, 298, 293 S.E.2d 118, 125 (1982)).  Under a *de novo* standard of review, this Court "considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008) (internal quotation marks omitted) (quoting *In re Appeal of The Greens of Pine Glen Ltd. P'ship*, 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003)).

## 2. Evidence of Deliberation

"The elements of first-degree murder are:  (1) the unlawful killing, (2) of another human being, (3) with malice, and (4) with premeditation and deliberation."  *State v. Coble*, 351 N.C. 448, 449, 527 S.E.2d 45, 46 (2000).  "'Deliberation' means that the intent to kill was formulated in a 'cool state of blood,' one 'not under the influence of a violent passion suddenly aroused by some lawful or just cause or legal provocation.'" *State v. Fields*, 315 N.C. 191, 200, 337 S.E.2d 518, 524 (1985) (quoting *State v. Lowery*, 309 N.C. 763, 768, 309 S.E.2d 232, 237 (1983)).  "The phrase 'cool state of blood' means that the defendant's anger or emotion must not have been such as to overcome the defendant's reason."  *State v. Elliott*, 344 N.C. 242, 267, 475 S.E.2d 202, 212 (1996) (internal quotation marks omitted) (quoting *State v. Thomas*, 332 N.C. 544, 560, 423 S.E.2d 75, 84 (1992), *overruled in part on other grounds in State v.*

*Richmond*, 347 N.C. 412, 430, 495 S.E.2d 677, 687, *cert. denied*, 525 U.S. 843, 119 S. Ct. 110, 142 L. Ed. 2d 88 (1998)), *cert. denied*, 520 U.S. 1106, 117 S. Ct. 1111, 137 L. Ed. 2d 312 (1997).

> Among other circumstances to be considered in determining whether a killing was with premeditation and deliberation are: (1) want of provocation on the part of the deceased; (2) the conduct and statements of the defendant before and after the killing; (3) threats and declarations of the defendant before and during the course of the occurrence giving rise to the death of the deceased; (4) ill will or previous difficulty between the parties; (5) the dealing of lethal blows after the deceased has been felled and rendered helpless; and (6) evidence that the killing was done in a brutal manner.

*State v. Hamlet*, 312 N.C. 162, 170, 321 S.E.2d 837, 843 (1984). As the Supreme Court has clearly stated, the fact that the killing may have occurred in the course of an altercation does not necessarily preclude a finding that the defendant acted after premeditation and deliberation.

> "[A]lthough there may have been time for deliberation, if the purpose to kill was formed and immediately executed in a passion, especially if the passion was aroused by a recent provocation or by mutual combat, the murder is not deliberate and premeditated. However, passion does not always reduce the crime since a man may deliberate, may premeditate, and may intend to kill after premeditation and deliberation, although prompted and to a large extent controlled by passion at the time. If the design to kill

> was formed with deliberation and premeditation, it is immaterial that defendant was in a passion or excited when the design was carried into effect." Thus a killing committed during the course of a quarrel or scuffle may yet constitute first degree murder provided the defendant formed the intent to kill in a cool state of blood before the quarrel or scuffle began and the killing during the quarrel was the product of this earlier formed intent.

*State v. Misenheimer*, 304 N.C. 108, 113-14, 282 S.E.2d 791, 795 (1981) (alteration in original) (citations omitted) (quoting *State v. Faust*, 254 N.C. 101, 108, 118 S.E.2d 769, 773, *cert. denied*, 368 U.S. 851, 82 S. Ct. 85, 7 L. Ed. 2d 49 (1961)), *overruled in part on other grounds*, *State v. Weaver*, 306 N.C. 629, 640, 295 S.E.2d 375, 381-82 (1982), *overruled in part on other grounds, State v. Collins*, 334 N.C. 54, 61-62, 431 S.E.2d 188, 193 (1993).

According to Defendant, the evidence presented at trial indicated that he had engaged in a heated argument with Mr. Phankhamsao immediately prior to firing the fatal shots and that this fact precluded a finding that he acted with deliberation. In support of this contention, Defendant notes that he removed his shoes in the customary manner prior to entering the Phankhamsao home, that the two men argued inside and outside the Phankhamsao residence, and that very little time elapsed between the time that Mrs. Phankhamsao shoved him and the firing of the

fatal shots. Although we agree that the evidence upon which Defendant relies would have supported a verdict convicting him of an offense less serious than first degree murder, we also believe that the record contains sufficient evidence to support a finding that Defendant acted with deliberation.

A careful review of the record evidence provides substantial support for a determination that Defendant killed Mr. Phankhamsao after premeditation and deliberation. For example, the record contains considerable evidence tending to show that there had been previous "ill will and difficulties" between the two men. Both Defendant and Villaphanh described an incident in which Mr. Phankhamsao became angry at Defendant and physically forced him from their home, with Defendant's account of this encounter containing references to death threats. In addition, the record contains evidence tending to show a lack of provocation on Mr. Phankhamsao's part in the period immediately prior to the shooting. According to the State's evidence, Defendant shot Mr. Phankhamsao after having been pushed by Mrs. Phankhamsao rather than by her husband. Moreover, the jury could have found that Mr. Phankhamsao did not provoke Defendant given that Mr. Phankhamsao only threatened to strike Defendant after being struck himself rather than actually striking Defendant. In addition, the record contains evidence tending to

show that Defendant went out of his way to bring a loaded firearm to what obviously threatened to be a confrontational environment. More specifically, the record contains evidence tending to show that Defendant returned to the location at which his weapon was kept between his visits to the Phankhamsao residence and was "pissed" at the time of his second visit. As we have already noted, the record establishes that Defendant shot Mr. Phankhamsao multiple times and suggests that at least two of these wounds were inflicted while Mr. Phankhamsao was in a prone position. The conduct in which Defendant engaged after the shooting, including his flight to Texas and certain intemperate references that he made during his interview with Detective Prado, provides further support for an inference that he premeditated and deliberated upon Mr. Phankhamsao's death. Thus, the record contains ample support for the jury's determination that Defendant was guilty of first degree murder.

Although the argument advanced in Defendant's brief focuses upon the moment at which Defendant grabbed his weapon and began firing at Mr. Phankhamsao, we do not believe that such a narrow focus is appropriate. Instead, we believe that a proper evaluation of Defendant's challenge to the trial court's judgment requires us to take a broader view of the record that includes all of the evidence relevant to Defendant's mental

state at the time of the shooting. For that reason, the fact that the record contained evidence tending to show that Defendant and Mr. Phankhamsao had reconciled their differences, while relevant, does not constitute conclusive proof that the elements required to support a first degree murder conviction did not exist. In addition, the existence of evidence that Defendant was angry at the time that he killed Mr. Phankhamsao does not preclude a finding that he acted after premeditation and deliberation given that "[a]n unlawful killing is deliberate and premeditated if done pursuant to a fixed design to kill, notwithstanding that defendant was angry or in an emotional state at the time, unless such anger or emotion was such as to disturb the faculties and reason." *State v. Myers*, 299 N.C. 671, 677, 263 S.E.2d 768, 772-73 (1980). In spite of the fact that Defendant claimed to be scared of what Mr. Phankhamsao might do to him, the record also suggests that Mr. Phankhamsao did nothing more than argue with Defendant and that Defendant fired multiple shots at Mr. Phankhamsao in spite of the fact that Mr. Phankhamsao had not assaulted him, a fact which tends to undercut any contention that Defendant's "anger or emotion was such as to disturb the faculties and reason." *Id.* Thus, none of Defendant's arguments persuade us that the trial court

erred by allowing the jury to determine whether Defendant acted after premeditation and deliberation.

As a result, after carefully considering the evidentiary record in the light most favorable to the State, we conclude that a reasonable juror could have determined that Defendant killed Mr. Phankhamsao with premeditation and deliberation. Although the record does contain evidence from which the jury could have reached a number of different decisions, we are satisfied that the trial court properly allowed "the jury [to] decide whether the facts show [D]efendant's guilt [of first degree murder] beyond a reasonable doubt." *Sokolowski*, 351 N.C. at 143, 522 S.E.2d at 69. As a result, Defendant's challenge to the sufficiency of the evidence to support his first degree murder conviction lacks merit.

## B. Defendant's Escape Attempt

Secondly, Defendant contends that the trial court erred by allowing the admission of evidence to the effect that he attempted to escape from the Montgomery County Jail. In support of this contention, Defendant argues that the challenged testimony had no relevance other than to show his "association with a murderer and his potential incorrigibility" and that the evidence in question, when considered in context, had no real

probative value. We do not find Defendant's argument persuasive.

At approximately 9:00 p.m. on 23 September 2010, Defendant attempted to escape from the Montgomery County Jail, in which he had been confined following his arrest and extradition. After climbing over an exterior fence along with Terrance Marshall, who had been charged with murder, Defendant attempted to get in a red Camaro operated by his sister. As Defendant struggled with the correctional officers who were attempting to apprehend him, Defendant's sisters came to his assistance, allowing Defendant to free himself from the officer's grip and use a canister of pepper spray that he had taken from the guard in an attempt to complete his escape. After other correctional officers arrived on the scene, Defendant was restrained and returned to custody.

On 17 May 2012, the State filed a motion *in limine* seeking to obtain authorization to present evidence of Defendant's flight to Texas and his subsequent attempt to escape from jail. The State brought its motion to the trial court's attention at the time that it attempted to elicit evidence concerning Defendant's attempt to escape from the Montgomery County Jail. At that time, Defendant objected to the admission of the evidence in question, arguing that this evidence should be

excluded given that the State had already obtained the admission of evidence that Defendant had fled to Texas after the killing of Mr. Phankhamsao.[2]

According to N.C. Gen. Stat. § 8C-1, Rule 402, "[a]ll relevant evidence is admissible," with "[e]vidence which is not relevant" being inadmissible. "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

---

[2]Although Defendant did make a pretrial motion to exclude evidence of Defendant's "prior acts" in reliance upon N.C. Gen. Stat. § 8C-1, Rule 404(b) (stating that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith," but "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident"), and cited N.C. Gen. Stat. § 8C-1, Rule 404(b) in seeking to persuade the trial court to exclude the evidence at issue in this section of our opinion, his principal argument in both the trial court and before this Court with respect to the present issue is predicated, almost exclusively, upon considerations made relevant by N.C. Gen. Stat. § 8C-1, Rules 402 and 403. As a result, as Defendant essentially concedes, a determination of the extent to which evidence that Defendant attempted to escape from the Montgomery County Jail was relevant for the purpose of showing flight and not subject to exclusion pursuant to N.C. Gen. Stat. § 8C-1, Rule 403, eliminates the necessity for considering whether the challenged evidence should have been deemed inadmissible pursuant to N.C. Gen. Stat. § 8C-1, Rule 404(b).

misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403. Although "a trial court's rulings on relevancy technically are not discretionary and therefore are not reviewed under [an] abuse of discretion standard," "such rulings are given great deference on appeal." *State v. Wallace*, 104 N.C. App. 498, 502, 410 S.E.2d 226, 228 (1991), *disc. review denied*, 331 N.C. 290, 416 S.E.2d 398, *cert. denied*, 506 U.S. 915, 113 S. Ct. 321, 121 L. Ed. 2d 241 (1992). "Whether to exclude evidence under [N.C. Gen. Stat. § 8C-1,] Rule 403 is a matter within the sound discretion of the trial court." *State v. Penley*, 318 N.C. 30, 41, 347 S.E.2d 783, 789 (1986).

According to well-established North Carolina law, "an escape from custody constitutes evidence of flight." *State v. Levan*, 326 N.C. 155, 165, 388 S.E.2d 429, 434 (1990). "Evidence of flight, in turn, is admissible as evidence tending to show the defendant's guilt." *State v. McDougald*, 336 N.C. 451, 456, 444 S.E.2d 211, 214 (1994). As a result, evidence tending to show that Defendant attempted to escape from the Montgomery County Jail after having been charged with the murder of Mr. Phankhamsao was clearly relevant to the matters at issue in this case.

In seeking to persuade us that the trial court should have excluded the challenged evidence, Defendant argues that, given his admission that he shot Mr. Phankhamsao and given that the record contained other evidence that he had fled the area after shooting Mr. Phankhamsao, evidence that he attempted to escape from the Montgomery County Jail in the company of another individual charged with murder added little to the State's case and severely prejudiced him in the eyes of the jury. However, given that the State was required to prove each element of the offenses submitted for the jury's consideration[3] beyond a reasonable doubt and given that the extent to which Defendant attempted to avoid apprehension was relevant to the issue of his guilt of one or more of these offenses, *State v. Warren*, 348 N.C. 80, 112, 499 S.E.2d 431, 449 (stating that, despite the defendant's concession that he should be found guilty of second degree murder, the fact that he "did not plead guilty to second-degree murder" meant that the trial court's decision to deliver a flight instruction did not constitute error on the theory that "the State was still required to prove each element of the charged offense"), *cert. denied*, 525 U.S. 915, 119 S. Ct. 263,

---

[3]The jury was allowed to consider whether Defendant was guilty of first degree murder on the basis of malice, premeditation, and deliberation; second degree murder; or voluntary manslaughter. As is noted in Defendant's brief, his trial counsel conceded his guilt of at least voluntary manslaughter.

142 L. Ed. 2d 216 (1998), the fact that the record contained other evidence of flight did not suffice to necessitate the exclusion of the challenged evidence. Although the evidence in question clearly cast Defendant in a bad light, its undoubted relevance did not render its admission unduly or unfairly prejudicial. As a result, given the relevance of this flight-related evidence to the issues that the jury was required to decide, we are unable to conclude that the trial court abused its discretion by allowing the admission of evidence tending to show that Defendant attempted to escape from the Montgomery County Jail.

### C. Description of Defendant's Conduct in Custody

Finally, Defendant contends that the trial court erred by allowing the admission of Detective Prado's description of the events depicted on a video that was introduced into evidence and played before the jury at trial. According to Defendant, the evidence in question should have been excluded because the "best evidence" of the events depicted on the video was the video itself. We are not persuaded by Defendant's argument.

At trial, Detective Prado testified that he observed Defendant by viewing the images depicted on a video camera trained on an interrogation room into which Defendant was brought after having been taken into custody. Detective Prado

routinely observed individuals whom he was about to interrogate in this fashion for the purpose of preparing himself for the "mentally draining" interrogation process. According to Detective Prado, Defendant placed his feet on the interrogation room table, an action that he had only seen one other suspect take despite having had years of law enforcement experience. In addition, Detective Prado testified that he observed Defendant laughing on five to seven occasions during the course of their conversation. Subsequently, a DVD depicting Defendant's conduct in the interrogation room prior to and during his discussion with Detective Prado was played for the jury.

N.C. Gen. Stat. § 8C-1, Rule 1002, provides that, "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by statute." N.C. Gen. Stat. § 8C-1, Rule 1002, is intended to prohibit the admission of "secondary evidence" concerning the contents of a document or a similar item when the original item is available. *State v. York*, 347 N.C. 79, 91, 489 S.E.2d 380, 387 (1997). Assuming, without in any way deciding, that the admission of Detective Prado's testimony concerning Defendant's conduct in the interrogation was erroneous, we are unable to see how Defendant was prejudiced by this ruling. As we have already noted, the

video in question was introduced into evidence and played for the jury, giving that body ample opportunity to determine if Detective Prado's testimony accurately described Defendant's conduct. Although Defendant contends that the information concerning Defendant's conduct in the interrogation room undercut his credibility and his claim to have acted without premeditation, deliberation, or a specific intent to kill, he does not contend that Detective Prado's description of his conduct was inaccurate or explain how his conduct as described by Detective Prado tended to show that he did not act with the mental state necessary for a finding that Defendant was guilty of first degree murder. As a result, given our inability to determine that there is a reasonable possibility that the outcome at Defendant's trial would have been different had Detective Prado been precluded from describing Defendant's conduct in the interrogation room, N.C. Gen. Stat. § 15A-1443(a) (stating that a non-constitutional error is prejudicial if there "is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises"), we conclude that Defendant's final challenge to the trial court's judgment lacks merit.

### III. Conclusion

Thus, for the reasons set forth above, we conclude that none of Defendant's challenges to the trial court's judgment have merit. As a result, the trial court's judgment should, and hereby does, remain undisturbed.

NO ERROR.

Judges ROBERT N. HUNTER, JR. and DAVIS concur.

Report per Rule 30(e).