IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA18-520

 Filed: 21 May 2019

Wilson County, Nos. 15 CRS 1879, 17 CRS 10-11

STATE OF NORTH CAROLINA

 v.

GREGORY K. PARKS

 Appeal by defendant from judgments entered 15 November 2017 by Judge

Wayland J. Sermons, Jr., in Wilson County Superior Court. Heard in the Court of

Appeals 16 January 2019.

 Attorney General Joshua H. Stein, by Assistant Attorney General Peter A.
 Regulski, for the State.

 Marilyn G. Ozer for defendant.

 ARROWOOD, Judge.

 Gregory K. Parks (“defendant”) appeals from judgments entered upon his

convictions for first degree murder, obtaining property by false pretenses, and

obtaining habitual felon status. For the following reasons, we affirm.

 I. Background

 A warrant for defendant’s arrest was issued and defendant was arrested on

19 August 2015 for the first degree murder and first degree kidnapping of Isabel

Calvo Palacios, who was last seen on 31 July 2015. A Wilson County Grand Jury
 STATE V. PARKS

 Opinion of the Court

indicted defendant on one count of first degree murder and one count of first degree

kidnapping on 12 October 2015. On 11 January 2017, the Grand Jury additionally

indicted defendant for obtaining the status of a habitual felon and on one count of

obtaining property by false pretense.

 Pretrial hearings took place in Wilson County Superior Court before the

Honorable Wayland J. Sermons, Jr., on 5 and 19 October 2017 to address the many

procedural and evidentiary motions filed by the parties, including motions by

defendant to exclude expert opinion testimony and motions to suppress evidence. The

case was then tried in Pitt County Superior Court before Judge Sermons between

23 October 2017 and 15 November 2017.1

 The evidence at trial tended to show that Palacios, a 20-year-old-woman, went

to defendant’s house on the night of 30 July 2015 to do drugs with defendant. Except

for leaving with defendant several times to obtain cocaine, Palacios spent the night

of 30 July 2015 and the early morning hours of 31 July 2015 smoking crack cocaine

with defendant at defendant’s house. During that same time period, Ronald Parker

was exchanging text messages with Palacios about meeting to hang out and smoke

weed together. Sometime between 3:00 and 5:00 a.m. on 31 July 2015, Parker arrived

at defendant’s house. Only Palacios’ vehicle was in the driveway. Palacios responded

to Parker at the door under the carport, but Palacios was unable to let him in because

 1 Both defendant and the State filed motions for change of venue, which the trial court
previously granted on 13 July 2017.

 -2-
 STATE V. PARKS

 Opinion of the Court

the deadbolt on the door was locked and could only be opened with a key. Parker

testified that Palacios was locked in the house. Parker asked Palacios if she wanted

to get out but she said she didn’t. Parker then left and came back later on Palacios’

instructions.

 Parker returned between 5:00 and 6:00 a.m. before the sun had risen. Both

Palacios’ and defendant’s vehicles were in the driveway. There were also two men,

referred to as Black and Harold, outside of defendant’s house. Defendant stated that

the men were trying to collect. Defendant called police about the men, but because

Palacios did not want to be involved with the police, she exited the house and got into

Parker’s vehicle. Parker and Palacios drove around until defendant notified them

that it was all clear. When they returned to defendant’s house, defendant let them

in through the door under the carport and locked the deadbolt as he closed the door

behind them. Parker recalled that Palacios and defendant were smoking crack

cocaine in the bedroom on the left-hand side of the hallway. Parker and Palacios then

went into another bedroom across the hallway, smoked marijuana, and had sex. After

they were finished, Palacios left the bedroom and Parker slept in the room for

approximately four hours until Palacios and defendant woke him up around 10:00

a.m. Parker left approximately 30 minutes later through the carport door; defendant

let him out and locked the deadbolt after he left. There was a baseball bat inside the

house behind the door.

 -3-
 STATE V. PARKS

 Opinion of the Court

 Parker drove around that afternoon smoking and selling marijuana with his

cousin, Matthew Jones. They drove by defendant’s house several times and Parker

thought it was unusual that Palacios’ vehicle was still there because Palacios had a

little daughter that she usually went home to. At 2:45 p.m., Parker called Palacios.

Parker testified that “[a]s soon as it rung she answered and she was screaming for

her life, help, help; somebody help me please; he’s hurting me; he’s hurting me; he’s

hurting me. . . . I heard a man which I think was [defendant] got on the phone and

said, we was just playing; she’s all right; she’s all right, and they hung the phone up.”

Parker drove around for a couple more hours and continued to call Palacios; those

calls went straight to voicemail.

 Parker and his cousin later went back to defendant’s house to check on

Palacios. Palacios’ vehicle was still there. Parker got out, knocked on the door, and

spoke to defendant through the door. Defendant told Parker that some Mexican guys

took Palacios. Parker then walked around the back of the house and noticed a broken

window and stains on the curtain that Parker said “looked like to me would be blood,

smear stains.” Parker called 911 at that time and told the operator about the earlier

phone call when he heard Palacios screaming, that Palacios’ vehicle was still at

defendant’s house but defendant said she was not there, and that they noticed a

busted out window with blood at the back of the house. Parker and his cousin did not

wait for police because they were high and had marijuana on them.

 -4-
 STATE V. PARKS

 Opinion of the Court

 Two Wilson police officers, Edwards and McKenzie, responded to the 911 call

and arrived at defendant’s house just before 6:00 p.m. on 31 July 2015 to do a welfare

check. Defendant let the officers inside and they spoke with defendant in the kitchen

area. Defendant told the officers that Palacios left with a Hispanic guy in a pickup

truck. Defendant also told the officers that Palacios left her vehicle there because it

was running hot. While the officers were talking with defendant, Parker and his

cousin returned and Officer Edwards stepped outside to speak with them. Parker

said that he told the officer that Palacios was missing and showed them the busted

out window and what he thought was blood. Officer McKenzie, who remained inside,

asked defendant if they could look around to make sure Palacios was not there.

Defendant agreed and, after Officer Edwards came back inside, led the officers

through the house allowing them to look in the rooms. It was not a thorough search;

they were not “pulling up, getting on the ground, looking under beds or anything like

that, just looking in rooms making sure we didn’t see anyone.” They were not looking

for blood evidence or any other kind of evidence. Officer McKenzie recalled there was

carpet in the bedroom on the left-hand side of the hallway and that a broken window

in the bedroom was covered. Defendant told the officers that earlier that day,

someone tried to break into his house so he broke the window in an attempt to get

out of the house. Officer McKenzie also noticed bedding soaking in the hallway

bathtub. Once the officers exited defendant’s house, they spoke with Parker. The

 -5-
 STATE V. PARKS

 Opinion of the Court

officers walked around the back of the house and noticed the broken window. The

officers, Parker, and Parker’s cousin then left.

 Later that same evening, at approximately 10:40 p.m., Parker returned to

defendant’s house with some guys from Palacios’ neighborhood to look for Palacios.

Palacios’ vehicle was still at defendant’s house. Both defendant and one of the guys

with Parker separately called 911. Two Wilson police officers, Harrison and Sherrill,

responded to the call between 10:45 p.m. and 11:00 p.m. Officer Harrison spoke with

the guys outside while Officer Sherrill spoke to defendant inside defendant’s house.

Officer Sherrill asked defendant where Palacios went and defendant told him that

“she had lost her keys and that she had left looking for them.” Defendant again

walked with the two officers around the house as they performed a welfare check

looking for Palacios. The officers looked everywhere they thought a human being

could be: in bedrooms, bathrooms, closets, under beds; they were not looking for other

evidence. Officer Sherrill recalled that there was red carpet in the bedroom on the

left-hand side of the hallway. The officers told the men outside that Palacios was not

in the house, and everyone left.

 Both sets of officers who responded to 911 calls on 31 September 2015 noted

that defendant was cooperative and calm. The officers also recalled that defendant

never mentioned Palacios bleeding in his house, or that he found Palacios’ keys.

 -6-
 STATE V. PARKS

 Opinion of the Court

 The following morning, on 1 August 2015, defendant picked up Shannon Dunn

to smoke crack cocaine. They went and got a crack rock, went back to Dunn’s house,

and then went to “Quick Pawn,” a pawn shop on Tarboro Street. Dunn waited in the

car as defendant went inside and pawned a 10 karat gold cluster ring for $25.00 in

cash. The ring was later identified as a ring given to Palacios in July 2015 and testing

on the ring was positive for blood and Palacios’ DNA. After pawning the ring,

defendant and Dunn got a second crack rock and went to defendant’s house.

Defendant locked the deadbolt on the door under the carport behind them and they

went back to the bedroom on the left-hand side of the hallway to smoke crack. Dunn

recalled that the bedroom stunk and defendant told her a woman threw up in the

room the night before. Dunn testified that she wanted to pick up pieces of the crack

rock from the floor after defendant broke the rock, but defendant did not want her on

the floor. Defendant told her there was glass on the floor. Dunn also testified that

defendant did not want her to use the hallway bathroom. Defendant and Dunn spent

all of 1 August 2015 searching for and smoking crack cocaine. On 2 August 2015,

defendant called Dunn to ask if her brother would help him put down new carpet.

Defendant told Dunn that he had been up all night tearing the carpet out of the

bedroom because he was tired of cutting his feet on glass in the carpet.

 At approximately 1:00 p.m. on 4 August 2015, Detective Tant of the Wilson

Police Department went to defendant’s house to follow up on a missing person’s report

 -7-
 STATE V. PARKS

 Opinion of the Court

for Palacios. Defendant arrived minutes after the detective arrived and invited the

detective into the house. They spoke inside in the kitchen area. Defendant told the

detective that he and Palacios smoked crack cocaine together and that she left to go

find money but could not find her keys. Defendant never mentioned that Palacios cut

her foot at his house. Detective Tant testified that he told defendant they would do

whatever it takes to find Palacios and at that moment, defendant “started shaking so

hard that he had to set [a] cup down before he dropped the cup.”

 Defendant voluntarily went to the Wilson Police Department main office

around 4:45 p.m. on 4 August 2015. Detective Godwin of the Wilson Police

Department interviewed defendant. Defendant told Detective Godwin about smoking

crack cocaine with Palacios on 30 and 31 July 2015 and that Palacios left around 2:30

p.m. on 31 July 2015. Defendant stated that Palacios lost her keys and that is why

her vehicle was still there, which detective Godwin noted was different from what

defendant initially told Officer McKenzie. When specifically questioned, defendant

stated that he tried to have sex with Palacios but he could not get an erection. After

initially stating police would find no blood in his house, defendant shifted his story

and said they may find a small amount of Palacios’ blood from stepping on glass.

Defendant also stated that he broke the window at his house while trying to get out

of the window when Black and Harold were at his house on 31 July 2015. Detective

Godwin did not notice any injuries to defendant’s hands. Defendant did not mention

 -8-
 STATE V. PARKS

 Opinion of the Court

to Detective Godwin that he had removed carpet from his house or that he had

cleaned blood from his house.

 That same evening following the interview, on 4 August 2015, a search

warrant was obtained and executed on defendant’s house. Defendant’s house was

seized for purposes of the search and defendant never returned to the house.

Defendant was cooperative at the time.

 During the search of defendant’s house, it was discovered that defendant had

removed the carpet from the bedroom on the left-hand side of the hallway. Red carpet

fibers were found leading from the door under the carport onto the driveway and in

the trunk of defendant’s vehicle. The carpet padding was discovered in a trashcan

outside of defendant’s house and tests on the padding were positive for blood with

Palacios’ DNA. A candlestick, a lamp, and a bath mat were also found in a trashcan

outside of defendant’s house and they tested positive for blood and Palacios’ DNA.

Blood spots or spray with Palacios’ DNA were discovered inside defendant’s house on

several walls in the bedroom on the left-hand side of the hallway, the deadbolt lock

on the bedroom door, pieces of flooring, and on a window. A shirt, clothes hamper,

newspaper, and ashtray recovered from defendant’s house also tested positive for

blood and Palacios’ DNA. Palacios’ car keys were found behind a statue figurine on

a built-in bookcase between the kitchen and living room area. Cleaning supplies

 -9-
 STATE V. PARKS

 Opinion of the Court

including Ammonia, bleach and carpet cleaner were also discovered during the

search. The baseball bat seen in defendant’s house was never recovered.

 When detectives took medicine to defendant on 6 August 2015 at the motel the

police department put him in, they asked defendant about the carpet. Defendant said

he put the carpet in his trunk and took it down to a corner where people drop stuff

off. Detectives did not find carpet fibers at the corner identified by defendant and

were never able to locate the carpet.

 During an interview of defendant on 19 August 2015, after defendant was

arrested and charged, defendant told detectives for the first time that he noticed blood

in his house on the afternoon of 31 July 2015 and that he cleaned up the blood.

Defendant also claimed to detectives for the first time that Palacios had smoked

marijuana laced with another drug and cut her hand near the broken window.

Defendant asked questions to detectives about the amount of blood discovered in his

house after the detectives mentioned luminol was used to find blood evidence.

Defendant specifically asked if they “found eight pints of blood in his house[,]” while

indicating that he knew the human body had eight pints of blood. When questioned

whether Palacios was killed in the bedroom, defendant indicated that she could have

been because anything is possible; but he did not know about it.

 Defendant also admitted to detectives that he traded drugs for sex from girls

that came to his house; and that he felt he was justified in hitting the girls if they did

 - 10 -
 STATE V. PARKS

 Opinion of the Court

not uphold their end of the bargain. The State presented evidence under Rule 404(b)

that defendant had been violent with a number of women in the past who had used

drugs with defendant and refused sex.

 Palacios was never found despite extensive search efforts by foot, vehicle,

helicopter, dogs, dive teams, and internet. No one, including Palacios’ family, has

heard from Palacios since 31 July 2015. There were, however, several possible

reported sightings.

 At the close of the State’s evidence, defendant moved to dismiss the first degree

murder charge, the first degree kidnapping charge, and the obtaining property by

false pretense charge. The trial court found insufficient evidence of premeditation

and deliberation to allow the State to proceed on that theory of first degree murder;

but found sufficient evidence to allow the State to proceed on the theory of first degree

felony murder. The trial court also found sufficient evidence to support the first

degree kidnapping and obtaining property by false pretense charges. Therefore, the

trial court denied defendant’s motion to dismiss.

 On 15 November 2017, the jury returned verdicts finding defendant guilty of

first degree felony murder by the commission of attempted second degree rape and

by the commission of second degree kidnapping, first degree kidnapping, obtaining

the status of an habitual felon, and obtaining property by false pretense. The trial

court arrested judgment on the first degree kidnapping conviction, entered a

 - 11 -
 STATE V. PARKS

 Opinion of the Court

judgment on the first degree felony murder conviction sentencing defendant to life

imprisonment without parole, and entered a judgment for obtaining property by false

pretense and obtaining habitual felon status sentencing defendant to a consecutive

term of 128 to 166 months imprisonment to begin at the expiration of the life

sentence. Defendant gave notice of appeal in open court.

 II. Discussion

 On appeal, defendant challenges the trial courts admission of expert

testimony, the trial court’s denial of a motion to suppress, and the trial court’s denial

of a motion to dismiss the charges.

 1. Expert Testimony

 Defendant first contends the trial court erred in allowing two forensic

pathologists to testify as to their expert opinions regarding the amount of blood

discovered in defendant’s house. Defendant asserts that the trial court’s decision to

allow their testimony was improper under Rule 702.

 It is the trial court’s role to decide preliminary questions concerning the

qualifications of experts to testify or the admissibility of expert testimony. N.C. Gen.

Stat. § 8C-1, Rule 104(a) (2017). “[T]he trial judge is afforded wide latitude of

discretion when making a determination about the admissibility of expert testimony.”

State v. Bullard, 312 N.C. 129, 140, 322 S.E.2d 370, 376 (1984). “The trial court’s

decision regarding what expert testimony to admit will be reversed only for an abuse

 - 12 -
 STATE V. PARKS

 Opinion of the Court

of discretion.” State v. Alderson, 173 N.C. App. 344, 350, 618 S.E.2d 844, 848 (2005).

However, “[w]here the plaintiff contends the trial court’s decision is based on an

incorrect reading and interpretation of the rule governing admissibility of expert

testimony, the standard of review on appeal is de novo.” Cornett v. Watauga Surgical

Grp., P.A., 194 N.C. App. 490, 493, 669 S.E.2d 805, 807 (2008).

 Rule 702 of the North Carolina Rules of Evidence governs testimony by

experts. Pertinent to defendant’s argument, the rule currently provides as follows:

 (a) If scientific, technical or other specialized knowledge
 will assist the trier of fact to understand the evidence
 or to determine a fact in issue, a witness qualified as an
 expert by knowledge, skill, experience, training, or
 education, may testify thereto in the form of an opinion,
 or otherwise, if all of the following apply:

 (1) The testimony is based upon sufficient facts or data.

 (2) The testimony is the product of reliable principles
 and methods.

 (3) The witness has applied the principles and methods
 reliably to the facts of the case.

N.C. Gen. Stat. § 8C-1, Rule 702 (2017).

 In State v. McGrady, 368 N.C. 880, 787 S.E.2d 1 (2016), our Supreme Court

discussed Rule 702 at length. The Court first explained the history of Rule 702 of the

Federal Rules of Evidence and how an amendment to Federal Rule 702 adopted in

2000 incorporated the exacting standards of reliability established in the United

States Supreme Court’s decisions in Daubert v. Merrell Dow Pharmaceuticals, Inc.,

 - 13 -
 STATE V. PARKS

 Opinion of the Court

509 U.S. 579, 125 L. Ed. 2d 469 (1993), General Electric Co. v. Joiner, 522 U.S. 136,

139 L. Ed. 2d 508 (1997), and Kumho Tire Co. v. Carmichael, 526 U.S. 137, 143 L. Ed.

2d 238 (1999). McGrady, 368 N.C. at 884-85, 787 S.E.2d at 6. The Court in McGrady

then explained that, although the original text of North Carolina’s Rule 702 and the

original text of Federal Rule 702 were largely identical, judicial construction of North

Carolina’s Rule 702 took a different path with our courts initially concluding that

“ ‘North Carolina is not, nor has it ever been, a Daubert jurisdiction’ ” and noting that

North Carolina has adopted a less mechanistic and rigorous approach than the

federal approach. McGrady, 368 N.C. at 886, 787 S.E.2d at 6-7 (quoting Howerton v.

Arai Helmet, Ltd., 358 N.C. 440, 469, 597 S.E.2d 674, 693 (2004). However, in 2011,

the General Assembly amended North Carolina’s Rule 702 to incorporate the three

reliability requirements now at the end of Rule 702(a) by adopting language virtually

identical to the 2000 amendment to the federal rule. McGrady, 368 N.C. at 887, 787

S.E.2d at 7; see also N.C. Gen. Stat. § 8C-1, Rule 702(a). The Court explained in

McGrady that “[b]y adopting virtually the same language from the federal rule into

the North Carolina rule, the General Assembly thus adopted the meaning of the

federal rule as well. In other words, North Carolina’s Rule 702(a) now incorporates

the standard from the Daubert line of cases.” Id. at 888, 787 S.E.2d at 7-8. Thus,

“the meaning of North Carolina’s Rule 702(a) now mirrors that of the amended

federal rule.” Id. at 884, 787 S.E.2d at 5.

 - 14 -
 STATE V. PARKS

 Opinion of the Court

 Upon establishing that North Carolina now followed the Daubert standard, the

Court explained that “Rule 702(a) has three main parts, and expert testimony must

satisfy each to be admissible.” McGrady, 368 N.C. at 889, 787 S.E.2d at 8 (footnote

omitted). First the relevance inquiry requires that “the area of proposed testimony

must be based on ‘scientific, technical or other specialized knowledge’ that ‘will assist

the trier of fact to understand the evidence or to determine a fact in issue.’ ” Id.

(quoting N.C.R. Evid. 702(a)). Second, the witness must be competent to testify as

an expert in the field of the proposed testimony; that is “the witness must be ‘qualified

as an expert by knowledge, skill, experience, training, or education.’ ” Id. at 889, 787

S.E.2d at 9. Third, “the testimony must meet the three-pronged reliability test that

is new to the amended rule [included in subsections (1) through (3) of Rule 702(a)].”

Id. at 890, 787 S.E.2d at 9.

 As stated above, in this case defendant specifically challenges the trial court’s

admission of expert opinion testimony from two forensic pathologists concerning the

amount of blood discovered in his house.

 The expert testimony was brought to the attention of defendant when the State

filed supplemental discovery and notices of expert witnesses on 2 October 2017. The

notices indicated the State would call two forensic pathologists to testify to an opinion

they reached in a report prepared jointly with a third forensic pathologist after a two-

hour meeting with the detectives and the assistant district attorney, during which

 - 15 -
 STATE V. PARKS

 Opinion of the Court

the pathologists reviewed photographs of the blood evidence discovered in defendant’s

residence, including photographs of a blood stain on carpet padding removed from a

bedroom, reviewed SBI lab reports, and discussed the crime scene with detectives.

The opinion the State sought to introduce from the report was that Palacios suffered

injuries that caused her to bleed in defendant’s home and the amount of blood lost,

given her small size, was sufficient to cause her death and would have caused her

death if she did not receive immediate medical attention.

 On 4 October 2017, defendant filed a motion in limine to exclude the opinion

testimony of the pathologists on the basis that the testimony was improper under

Daubert and McGrady. The motion in limine was first addressed before the trial

court at the pretrial hearing on 5 October 2017. At that time, defense counsel argued

there was nothing showing the experts had conducted any testing or done anything

to qualify them to testify about the blood. Defense counsel remarked, “[j]ust because

you’re a pathologist doesn’t mean you can step out here and all of a sudden talk about

quantification and [the] amount of blood you see at a scene through photographs and

hear somebody tell you about what color blood it is.” Upon hearing defendant’s

concerns, the trial court indicated it would conduct a pretrial hearing on the

qualifications of the State’s expert witnesses after jury selection but before the

witnesses testify.

 - 16 -
 STATE V. PARKS

 Opinion of the Court

 That pretrial hearing was held on 24 October 2017, at which time the trial

court considered the voir dire testimony of the State’s expert witnesses, Dr. M.G.F.

Gilliland and Dr. Karen L. Kelly, and considered arguments. Noting defendant’s

objection, the trial court announced its decision in open court as follows:

 In this case I’m going to rule that the exact language of the
 opinion as contained in the August -- or October 2nd, 2017
 written opinion does go beyond the scope of Daubert in its
 last sentence. However, I am going to find that the experts
 may testify that based upon their training and experience
 the amount of blood loss observed in the crime scene
 information in this case is significant -- I’m going do [sic]
 let them say that -- it is consistent with other amounts of
 blood loss in cases which the victim would require
 immediate medical attention to survive. And that’s as far
 as I’m going to let them go.

 Thereafter at trial, in addition to offering unchallenged testimony regarding

blood evidence found in different areas and on different objects in defendant’s house,

the trial court allowed Dr. Gilliland and Dr. Kelly to testify, over defendant’s

objections, to their opinions as to the amount of blood. Dr. Gilliland testified that

based on all the evidence that she saw in this case, and based on her prior training

and experience, she was able to form a medical opinion in this case. Dr. Gilliland

then testified, “[m]y opinion is that based on the amount of blood loss that I

estimated[,] that this individual had suffered a significant blood loss. . . . In my

opinion individuals who have suffered this kind of blood loss are in need of medical

attention.” Dr. Gilliland further testified that she has been involved in cases in the

past where she has seen individuals with similar amounts of blood loss and those

 - 17 -
 STATE V. PARKS

 Opinion of the Court

victims had required immediate medical attention. Dr. Kelly similarly testified, “[s]o

with all the things that we have seen and the presence of the stain in the padding,

it’s my opinion that there was a significant amount of blood present at the scene.” Dr.

Kelly then stated, “[b]ased on my training and experience at scenes of death[,] that

there was a significant amount of blood at the scene and that it’s consistent with other

scenes that I have seen in the past, and that if the victim had not received, that the

victim would have required medical attention very quickly.”

 Just as defendant argued below, defendant now argues that the admission of

this expert opinion testimony was improper under Daubert and McGrady because the

testimony violated every reliability requirement for admission under Rule 702.

Defendant does not challenge the relevance of the testimony or the qualifications of

the witnesses. Defendant only contests the reliability.

 As noted above, the three-pronged reliability test added to North Carolina Rule

702 by the 2011 amendment requires all of the following: “(1) The testimony is based

upon sufficient facts or data. (2) The testimony is the product of reliable principles

and methods. (3) The witness has applied the principles and methods reliably to the

facts of the case.” N.C. Gen. Stat. § 8C-1, Rule 702(a)(1)-(3). Relying on Daubert,

Joiner, and Kumho, the Court explained in McGrady as follows:

 The primary focus of the inquiry is on the reliability of the
 witness’s principles and methodology, not on the
 conclusions that they generate. However, conclusions and
 methodology are not entirely distinct from one another,

 - 18 -
 STATE V. PARKS

 Opinion of the Court

 and when a trial court conclude[s] that there is simply too
 great an analytical gap between the data and the opinion
 proffered, the court is not required to admit opinion
 evidence that is connected to existing data only by the ipse
 dixit of the expert.

McGrady, 368 N.C. at 890, 787 S.E.2d at 9 (citations and quotation marks omitted).

The Court further pointed out that cases have “articulate[d] particular factors that

may indicate whether or not expert testimony is reliable” and that, “[i]n its discretion,

the trial court should use those factors that it believes will best help it determine

whether the testimony is reliable in the three ways described in the text of Rule

702(a)(1) to (a)(3).” Id.

 In arguing the admission of the testimony violated every reliability

requirement of Rule 702(a), defendant points to many of those factors identified in

McGrady. It is clear from the pathologists’ voir dire testimony that their opinions on

the amount of blood loss were not based on published reports, were not subject to peer

review, and had not been tested for a potential rate of error. One of the pathologists

explicitly agreed with the court that the opinion was “not based on any type of peer

review authorized formulas, extrapolations or anything that can be objectively

quantified and tested and held up against other researches who may have different

opinions[.]” It is also clear that the pathologists’ opinions in this case were formed

specifically for the purpose of litigation and based on information gathered during

the meeting with detectives and the assistant district attorney.

 - 19 -
 STATE V. PARKS

 Opinion of the Court

 However, even with these factors generally weighing against the admission of

expert testimony, we are mindful that

 [t]he precise nature of the reliability inquiry will vary from
 case to case depending on the nature of the proposed
 testimony. In each case, the trial court has discretion in
 determining how to address the three prongs of the
 reliability test. The trial court must have the same kind of
 latitude in deciding how to test an expert’s reliability . . .
 as it enjoys when it decides whether that expert’s relevant
 testimony is reliable.

McGrady, 368 N.C. at 890, 787 S.E.2d at 9 (citations and quotation marks omitted)

(emphasis in original).

 Here, it is evident that the trial court understood the reliability requirements

and limited its decision to allow the testimony based on the type of testimony being

offered and nature of the pathologists’ work. We hold it was within the trial court’s

discretion to do so.

 The court specifically explained to the witnesses that “the inquiry of the [c]ourt

is that the methodology that you used in coming up with your opinions have to be

based on reliable data and scientific methods[,]” and expressed concern that the

opinion in the report that the State sought to admit was a subjective opinion “about

somebody with this amount of loss that we observed would have died.” The court

directly acknowledged defendant’s concern that the pathologists could not quantify

the amount of blood loss in volume from crime scene photographs and questioned the

State about how the opinion testimony based on experience was admissible after

 - 20 -
 STATE V. PARKS

 Opinion of the Court

“Daubert . . . tightened up [the] requirement that opinions be based upon reliable,

scientific methods . . . .” The trial court indicated it was having trouble with the

opinion testimony that Palacios would have died from the blood loss, but believed it

was proper for the pathologists to testify that the blood loss was “consistent” with

blood loss observed in other cases where the person suffering the blood loss would

have died without immediate medical attention. The court explained that the

difference between the two opinions was that the opinion comparing the blood loss to

other cases was clearly based upon the training and experience of the pathologists.

 In response to the trial court’s questions, the defense argued that the problem

with the opinion the State sought to admit was that the “opinion goes too far. It is

beyond what they should and could be able to testify to.” Defendant, however,

acknowledged that the pathologists could testify to what they see and that our law

“seems to allow language in questions being asked to experts about something being

consistent. That question would be closer to allowing them to answer that question

than it would be to receive an opinion such as what [the State sought to admit from

the report.]”

 As shown in the trial court’s decision, set forth above, the court refused to allow

the pathologists to testify to the opinion the State sought to admit from the report,

holding that the opinion went beyond the scope of Daubert. The trial court instead

 - 21 -
 STATE V. PARKS

 Opinion of the Court

limited the pathologists’ opinion testimony to comparing the blood loss in this case to

blood loss in other cases, which the defense accepted was more proper.

 We agree with the trial court that the opinion testimony allowed into evidence

is in line with the nature of forensic pathology work. While the pathologists are

trained medical doctors and educated on the amount of blood in a human body and

statistics for blood loss, the pathologists testified that that information served only

as a base of knowledge from which they must use their training and experience as

doctors and forensic pathologists. The pathologists testified that it is impossible to

measure the amount of blood, in terms of volume, at a crime scene; therefore, they

did not provide any numbers to quantify the amount of blood loss in this case.

Instead, the pathologists explained that doctors are trained to look at blood loss,

compare different amounts, and determine if medical attention is needed; and as a

forensic pathologist, they have dealt with many cases involving the determination of

whether blood loss was a cause of death.

 Here, the pathologists’ testimony was based on photographs of the crime scene,

SBI lab results, and discussions with the detectives involved in the case. Without

objection, the pathologists testified on the blood evidence discovered in defendant’s

house based on what they observed in the photographs and lab reports, and discussed

with detectives. The pathologists testified that it was routine in the field of forensic

pathology to rely on such data and information from other sources and that they use

 - 22 -
 STATE V. PARKS

 Opinion of the Court

photographs a couple hundred times each year to form medical opinions. The

testimony was that it was less common for them to actually go to a crime scene

because of the large area that their office covers. The pathologists also explained how

they compare the data and observations with what they have experienced at other

crime scenes to form an opinion. Both pathologists testified that it was common in

the field of forensic pathology to form opinions based on comparisons with other cases

and acknowledged they deal with blood loss and render opinions as to a cause of death

on a daily basis. Testimony was given that it was “absolutely” a normal part of

forensic pathology to determine if someone has died or needed medical attention as a

result of blood loss. Dr. Kelly added that experience is an accepted form of

methodology in the field of forensic pathology.

 Both pathologists in this case testified that they have been involved in

hundreds of cases where they have had to look at crime scene photographs of blood

and a body, to which they could compare the data and observations in this case.

Based on their experience, the pathologists responded to the trial court’s inquiry that

they were able to testify that the amount of blood in this case would be consistent

with a person who would need immediate medical attention. Dr. Gilliland added that

her opinion was to a reasonable degree of medical certainty.

 Upon review of the voir dire, we hold the trial court understood the reliability

standard and properly formulated a test in this case to judge the reliability of the

 - 23 -
 STATE V. PARKS

 Opinion of the Court

pathologists’ opinion testimony based on the nature of that testimony. That inquiry

showed that the pathologists’ testimony was based on the facts and data typically

relied on in the field of forensic pathology, and that the pathologists compared the

information presented to hundreds of other cases which they have seen to form an

opinion that the blood loss in this case was significant. Thus, we hold the trial court

properly determined that the pathologists’ testimony was based on sufficient facts or

data, was the product of reliable principles and methods, and that they reliably

applied those principles and methods in this case. The trial court did not abuse its

discretion in this case in admitting the limited opinion testimony of the pathologists.

 Moreover, we emphasize that the only testimony that defendant challenges is

the pathologists’ opinions that the amount of blood loss was consistent with blood loss

in other cases where the victim required immediate medical attention. Defendant

does not challenge the admissibility of the pathologists’ testimony as to what they

observed in the crime scene photographs. That evidence was properly admitted and

put before the jury. It is not clear to this Court that, even if the opinion testimony

was improper, that the testimony would rise to the level of prejudice requiring a new

trial given the other evidence in the case.

 2. Motion to Suppress

 Defendant next claims that the trial court’s denial of his motion to suppress

violated his constitutional rights against unreasonable search and seizure.

 - 24 -
 STATE V. PARKS

 Opinion of the Court

Defendant filed numerous motions to suppress on 4 October 2017, but now

specifically challenges the denial of his motion to suppress evidence collected during

the search of his residence pursuant to the warrant issued on 4 August 2015.

Defendant contends evidence collected during the search must be suppressed because

the search warrant was issued based on an affidavit containing false and misleading

information.

 In Franks v. Delaware, the United States Supreme Court addressed whether

“a defendant in a criminal proceeding ever [has] the right, under the Fourth and

Fourteenth Amendments, subsequent to the ex parte issuance of a search warrant, to

challenge the truthfulness of factual statements made in an affidavit supporting the

warrant[.]” 438 U.S. 154, 155, 57 L. Ed. 2d 667, 672 (1978). The Court recognized

that “[t]here is . . . a presumption of validity with respect to the affidavit supporting

the search warrant[,]” id. at 171, 57 L. Ed. 2d at 682, but held that,

 where the defendant makes a substantial preliminary
 showing that a false statement knowingly and
 intentionally, or with reckless disregard for the truth, was
 included by the affiant in the warrant affidavit, and if the
 allegedly false statement is necessary to the finding of
 probable cause, the Fourth Amendment requires that a
 hearing be held at the defendant’s request. In the event
 that at that hearing the allegation of perjury or reckless
 disregard is established by the defendant by a
 preponderance of the evidence, and, with the affidavit’s
 false material set to one side, the affidavit’s remaining
 content is insufficient to establish probable cause, the
 search warrant must be voided and the fruits of the search
 excluded to the same extent as if probable cause was

 - 25 -
 STATE V. PARKS

 Opinion of the Court

 lacking on the face of the affidavit.

Id. at 155-56, 57 L. Ed. 2d at 672. In reaching its holding, the Court emphasized that

the Fourth Amendment requirement of a showing of probable cause is premised on

the assumption that there will be a “truthful showing,” id at 164-65, 57 L. Ed. 2d at

678 (emphasis in original); but explained that

 [t]his does not mean “truthful” in the sense that every fact
 recited in the warrant affidavit is necessarily correct, for
 probable cause may be founded upon hearsay and upon
 information received from informants, as well as upon
 information within the affiant’s own knowledge that
 sometimes must be garnered hastily. But surely it is to be
 “truthful” in the sense that the information put forth is
 believed or appropriately accepted by the affiant as true.

Id. at 165, 57 L. Ed. 2d at 678.

 Applying the analysis set forth in Franks in State v. Fernandez, 346 N.C. 1,

484 S.E.2d 350 (1997), our Supreme Court explained that

 [u]pon any evidentiary hearing, the only person whose
 veracity is at issue is the affiant himself. A claim under
 Franks is not established merely by evidence that
 contradicts assertions contained in the affidavit, or even
 that shows the affidavit contains false statements. Rather,
 the evidence must establish facts from which the finder of
 fact might conclude that the affiant alleged the facts in bad
 faith.

Fernandez, 346 N.C. at 14, 484 S.E.2d at 358 (citations omitted). As our courts have

recognized, N.C. Gen. Stat. § 15A-978 codifies the rule enunciated in Franks and

provides, in pertinent part, as follows:

 (a) A defendant may contest the validity of a search

 - 26 -
 STATE V. PARKS

 Opinion of the Court

 warrant and the admissibility of evidence obtained
 thereunder by contesting the truthfulness of the
 testimony showing probable cause for its issuance. The
 defendant may contest the truthfulness of the
 testimony by cross-examination or by offering evidence.
 For the purposes of this section, truthful testimony is
 testimony which reports in good faith the circumstances
 relied on to establish probable cause.

N.C. Gen. Stat. § 15A-978(a) (2017).

 In defendant’s motion to suppress, defendant went through each paragraph of

the affidavit submitted in the search warrant application and took issue with certain

statements. The trial court heard and denied defendant’s motion to suppress on

19 October 2017, and later filed a written order on 13 November 2017. In the order,

the trial court addressed each of defendant’s assertions, but found that only one

paragraph in the affidavit could not be considered for issuance of the search warrant.

The trial court further found that the defendant’s other allegations were simply

disagreements with the averments made in the affidavit and determined that, with

the exclusion of the one paragraph that could not be considered, the remainder of the

affidavit was sufficient to support the necessary finding of probable cause to issue the

search warrant.

 Now on appeal, just as defendant did below, defendant identifies statements

in the affidavit that he contends are false or unrelated to the case, and identifies

omissions from the affidavit that he asserts were misleading. Defendant, however,

does not specifically attack the veracity of the affiant; defendant simply asserts that

 - 27 -
 STATE V. PARKS

 Opinion of the Court

given the number of false or misleading statements and the misleading omissions,

“the only possible conclusion is that the affidavit was written with reckless disregard

for the truth or because the officers acted in bad faith . . . .” Upon review of the

evidence, we are not convinced.

 Although not all statements in the affidavit are entirely accurate, the evidence

supports some version of those challenged statements and defendant has not met his

burden to establish by the preponderance of the evidence that the affiant made those

statements in reckless disregard to the truth or in bad faith. See State v. Haymond,

203 N.C. App. 151, 159, 691 S.E.2d 108, 117 (2010) (“[A] defendant must ‘establish

facts from which the finder of fact might conclude that the affiant alleged the facts in

bad faith.’ He cannot rely on evidence that merely ‘contradicts assertions contained

in the affidavit, or even that shows the affidavit contains false statements.’ ”) (quoting

Fernandez, 346 N.C. at 14, 484 S.E.2d at 358). Thus, the trial court did not err in

denying defendant’s motion to suppress.

 3. Motion to Dismiss

 In the final issue on appeal, defendant contends the trial court erred in denying

his motions to dismiss made at the close of the State’s evidence and renewed at the

close of all of the evidence. As detailed in the background above, the trial court

determined there was insufficient evidence of premeditated first degree murder, but

 - 28 -
 STATE V. PARKS

 Opinion of the Court

determined there was sufficient evidence for the State to proceed on first degree

felony murder and the kidnapping and obtaining property by false pretense charges.

 “This Court reviews the trial court’s denial of a motion to dismiss de novo.”

State v. Smith, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). “ ‘Upon defendant’s

motion for dismissal, the question for the Court is whether there is substantial

evidence (1) of each essential element of the offense charged, or of a lesser offense

included therein, and (2) of defendant’s being the perpetrator of such offense. If so,

the motion is properly denied.’ ” State v. Fritsch, 351 N.C. 373, 378, 526 S.E.2d 451,

455 (quoting State v. Barnes, 334 N.C. 67, 75, 430 S.E.2d 914, 918 (1993)), cert.

denied, 531 U.S. 890, 148 L. Ed. 2d 150 (2000). “Substantial evidence is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.”

State v. Smith, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). “In making its

determination, the trial court must consider all evidence admitted, whether

competent or incompetent, in the light most favorable to the State, giving the State

the benefit of every reasonable inference and resolving any contradictions in its

favor.” State v. Rose, 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994), cert. denied, 515

U.S. 1135, 132 L. Ed. 2d 818 (1995).

 Defendant contends the evidence in this case falls short of substantial evidence

and raises only a suspicion that defendant murdered, kidnapped, or raped Palacios;

or that defendant was not in lawful possession of the ring that he sold to the pawn

 - 29 -
 STATE V. PARKS

 Opinion of the Court

shop. More specifically, defendant asserts that although there was evidence of

Palacios’ disappearance, there was little evidence that she was dead or that defendant

caused her death. Defendant further asserts the State failed to produce evidence that

Palacios was restrained in the house or desired to leave; that defendant and Palacios

engaged in nonconsensual sexual activities; or that Palacios did not give defendant

the ring in exchange for drugs.

 The State concedes that, because this is a no body case, its case is based

primarily on circumstantial evidence. Citing State v. Sokolowski, 351 N.C. 137, 147,

522 S.E.2d 65, 71 (1999) (comparing circumstantial evidence to strands in a rope in

that “no one of them may be sufficient in itself, but all together may be strong enough

to prove the guilt of the defendant beyond reasonable doubt”) (quoting State v. Austin,

129 N.C. 534, 535, 40 S.E. 4, 5 (1901)), the State argues that the combined

circumstantial evidence presented in this case was sufficient to prove defendant’s

guilt.

 Circumstantial evidence may withstand a motion to
 dismiss and support a conviction even when the evidence
 does not rule out every hypothesis of innocence. If the
 evidence presented is circumstantial, the court must
 consider whether a reasonable inference of defendant’s
 guilt may be drawn from the circumstances. Once the court
 decides that a reasonable inference of defendant’s guilt
 may be drawn from the circumstances, then it is for the
 jury to decide whether the facts, taken singly or in
 combination, satisfy [it] beyond a reasonable doubt that the
 defendant is actually guilty.

 - 30 -
 STATE V. PARKS

 Opinion of the Court

Fritsch, 351 N.C. at 379, 526 S.E.2d at 455 (citation and quotation marks omitted)

(emphasis in original).

 Here, the State directs this Court’s attention to the following circumstantial

evidence: Palacios was last seen at defendant’s residence in defendant’s company on

31 July 2015; no one has heard from Palacios since 31 July 2015, not even her family;

extensive efforts by law enforcement to find Palacios have been unsuccessful; Palacios

sounded distressed during a phone call with Parker on 31 July 2015, in which Parker

heard Palacios yell “he’s hurting me,” followed by defendant stating they were just

playing before hanging up the phone; Palacios’ cellular phone pinged a tower near

defendant’s residence during the call between Palacios and Parker and last pinged a

tower near defendant’s residence before it “went dark”; Palacios’ vehicle was left in

defendant’s driveway after she disappeared; defendant maintained control over who

entered and left his house, and when they entered and left his house, by locking

deadbolts and maintaining control of the keys; defendant traded drugs for sex with

girls and would become violent when the girls refused sex after he provided drugs;

defendant possessed a ring belonging to Palacios, which had blood on it, and pawned

it for cash the day after she disappeared; there was a bad odor in defendant’s

residence the day after Palacios went missing; defendant did not want Dunn to touch

his bedroom carpet or use the hallway bathroom the day after Palacios disappeared;

defendant removed his bedroom carpet within days of Palacios’ disappearance and it

 - 31 -
 STATE V. PARKS

 Opinion of the Court

was never found; defendant removed blood stained carpet padding from his bedroom;

evidence of blood, including drips, spray, and smears, was found in defendant’s

residence; lab tests on blood evidence discovered in defendant’s house indicated that

it contained Palacios’ DNA; the amount of blood discovered in defendant’s residence

was consistent with cases in which the victims needed immediate medical attention;

defendant cleaned his house after Palacios’ disappearance and cleaning products

were discovered; a baseball bat seen in defendant’s residence as recently as the

morning of Palacios’ disappearance was never found; Palacios’ car keys were found in

defendant’s house; defendant’s explanations shifted once more evidence was

discovered; and defendant appeared nervous to a detective.

 Defendant attempts to explain this evidence, and highlights evidence that is

favorable to his defense. However, when the evidence is viewed in the light most

favorable to the State, as it must be, we agree with the State that the circumstantial

evidence is sufficient to support a reasonable inference of defendant’s guilt on each

charge to survive defendant’s motion to dismiss the charges. Thus, the trial court did

not err in allowing the jury to decide the case.

 III. Conclusion

 For the reasons discussed, we find no error and hold the defendant received a

fair trial.

 NO ERROR.

 - 32 -
 STATE V. PARKS

 Opinion of the Court

Judge DILLON concurs

Judge MURPHY concurs in a separate opinion.

 -2-
 No. COA18-520 – State v. Parks

 MURPHY, Judge, concurring.

 I concur fully with Majority’s analysis in Parts II-2 and II-3. However, I concur

in Part II-1 solely because our review of the trial court’s decision is strictly for an

abuse of discretion. McGrady, 368 N.C. at 890, 7877 S.E.2d at 9.